THE LESSEE OF EDWARD LIVINGSTON AND OTHERS v. JOHN MOORE AND OTHERS.

The titles to lands under the acts of the legislature of the state of Pennsylvania, providing for the sale of the landed estate of John Nicholson, in satisfaction of the liens the state held on those lands, and the proceedings under the same, are valid.

These acts, and the proceedings under them, do not contravene the provisions of the constitution of the United States, in any manner whatsoever.

The words used in the constitution of Pennsylvania in declaring the extent of the powers of its legislature, are sufficiently comprehensive to embrace the powers exercised over the estate of John Nicholson.

IN error to the circuit court of the United States for the eastern district of Pennsylvania.

In the circuit court, the plaintiffs in error instituted an ejectment for a tract of land in the county of Franklin, in the state of Pennsylvania. They showed title to the land as the heirs of John Nicholson, who was seised of the same at the time of his death, under a warrant, survey and return of survey, and payment of the purchase money to the state.

The title of the defendants was regularly derived from a sale of the lands of John Nicholson, made under the authority of the state of Pennsylvania, towards satisfying the lien claimed by the state for the debts due by John Nicholson, arising from his defalcation as the comptroller-general of the state.

The constitutionality and validity of that lien were denied by the plaintiffs.

On the 13th of April 1782, John Nicholson was, by an act of the legislature of Pennsylvania, appointed comptroller-general of the state, and was entrusted with large powers for the collection of the debts due to the state, the settlement of public accounts, and the management of the funds of the state.

Mr Nicholson acted as comptroller for twelve years, during which time he was impeached, tried and and acquitted. He afterwards, on the 11th of April 1794, resigned the office.

By accour*s stated, on the 19th of November 1796, large

· [Lessee of Livingston v. Moore and others.]

oalances were found to be due by Mr Nicholson to the state of Pennsylvania. On an account, No. 1, headed " Dr, John Nicholson, account in continental certificates with the state of Pennsylvania, Cr," the balance was fifty-one thousand two hundred and nine dollars and twenty-two cents; and on another account, No. 2, headed " Dr, John Nicholson, account, three per cent stock in account with the state of Pennsylvania, Cr," the balance was stated to be sixty-three thousand seven hundred and thirty-one dollars and six cents.

The original accounts were given in evidence on the trial in the circuit court, and also counterparts of them signed by the respective officers, upon which were indorsements, one in the handwriting of Mr Nicholson, the other in that of his counsel in a suit instituted against him for the recovery of the debts due to the state.

A suit was commenced in the supreme court of Pennsylvania, by the state against John Nicholson to September term 1793, for the loss sustained by the state on certain certificates, which it was alleged he had improperly subscribed; and a verdict was obtained against him on the 18th of December 1795, for four thousand two hundred and eight pounds eight shillings and ten pence. No execution was ever issued on this judgment.

To September term 1795 another suit was instituted by the state of Pennsylvania against John Nicholson, being an action of trover for certain continental certificates and funded stock of the United States. Judgment was entered in this suit on the 20th of March 1797, on the following agreement, signed by the attorney-general of the state, and by the counsel for the defendant.

" 21st of March 1797, by agreement filed, the judgment is for the sum of one hundred and ten thousand three hundred and ninety dollars and eighty-nine cents, rating the stock as follows: six per cent at sixteen shillings and ninepence in the pound; three per cent at ten shillings; militia certificates at fifty per cent; and that, in the set off, the stock be allowed at the same rate; the defendant to be allowed three months to point out any errors to the satisfaction of the comptroller and register general, such errors to be deducted from the sum for which

[Lessee of Livingston v. Moore and others.]

judgment shall be entered.    Certificates and receipts to be credited also, with the charges of the funded debt.    Errors against the commonwealth, if any, also to be corrected.    The sum for which judgment is now entered, to be altered by the subsequent calculation of the comptroller-general alone.    Supreme court, costs taxed at thirty-five dollars and thirty-five cents."

Executions were issued on the judgment in the year 1798, and afterwards in 1803, to many counties in the state, and proceedings to condemn the lands of the defendant took place. Between the 8th of March 1796, when the first set lement of the accounts of John Nicholson was made, and the 21st of March 1797, when the state judgment was entered, many judgments were obtained by the private creditors of Mr Nicholson, which remain unsatisfied on the records.    On some of these judgments executions were issued and levies made on the real estate of the defendant prior to the executions levied by the state on the same lands.    Mr Nicholson was arrested under executions by private creditors, and died in prison in December 1800.    His heirs were then minors, and they all left the state prior to 1804.

The legislature of Pennsylvania passed at different periods, laws for the settlement of accounts and the collection of debts due to the state.

By an act passed on the 18th of February 1785, it was provided, " that the settlement of any public account by the comptroller, and confirmation thereof by the supreme executive council, whereby any balance or sum of money shall be found due from any person to the commonwealth, shall be deemed and adjudged to be a lien on all the real estate of such person throughout this state, in the same manner as if judgment had been given in favour of the commonwealth, against such person for such debt in the supreme court ; and if, after an appeal from the said settlement of accounts by, or award of, the said comptroller-general, and confirmation thereof by the supreme executive council, the said settlement shall be confirmed, the said supreme court shall award interest thereon, from the date of the confirmation of the said settlement of account by the supreme executive council, and costs, to be paid by the appel-

lees." By the sixth section of this act, if the governor is dissatisfied with a settlement, or of opinion that a legal discussion will tend to the furtherance of justice, he may direct a suit, which shall be proceeded in as in other civil actions. By an act passed 1st of April 1790, the office of register-general having been created, all accounts are first to be settled by him and afterwards examined by the comptroller-general, and then transmitted to the executive council for its approbation. And by the fifth section, all settlements, under this act, shall have the same force and effect, and be subject to the same appeal as those made formerly by the comptroller-general. After the passage of these acts, the constitution of the state was changed, and the executive power was vested in a governor instead of the executive council. On the 14th of January 1791, an act was passed by which all duties directed to be done by the president and executive council, shall be done by the governor. This act was limited to the end of the session.

On the 13th April 1791, the act of 1st April 1790 was continued to the end of the then session; but with a proviso that in all cases when accounts examined and settled by the comptroller and register, or either of them, have heretofore been referred to the executive authority, to be by it approved and allowed, or rejected, the same shall only in future be referred to the governor, when the comptroller and register shall differ in opinion; but in all cases where they agree, only the balances due on each account shall be certified by the said comptroller and register to the governor, who shall thereupon proceed in like manner as if the said accounts had been referred to him according to the former laws on the subject; and provided always, that in all cases when the party or parties shall not be satisfied with the settlement of the accounts by the comptroller and register, or when there shall be reason to suppose that justice has not been done to the commonwealth, the governor may, and shall, in like manner, and upon the same conditions as heretofore, allow appeals, or cause suits to be instituted, as the case may require. By the act of 28 March 1792, this law was continued until the end of the next session.

By two other acts, it is continued to the end of the session of 1793, 1794.

[Lessee of Livingston v. Moore and others.]

An act was passed 22d April 1794, reciting, that under the old constitution, acts were passed vesting powers in the executive council or president, and that it was expedient such powers should be vested in the governor, which enacts, "that in all cases where, by the laws of the commonwealth, the supreme executive council, or the president, or vice-president thereof, is mentioned as having power and authority to carry the same into effect, the governor for the time being shall be deemed and taken to be in the place and stead of the same supreme executive council, or the president or the vice-president thereof, and shall have and exercise all the powers in them, or any or either of them vested, unless such powers have been, and are by law vested in some other officer or officers, person or persons, or shall be inconsistent with the provisions contained in the existing constitution of the commonwealth."

By this act all accounts are in the first instance to be submitted to the register, who shall adjust and send them to the comptroller, who, if he approve the settlement, shall return the same to the register. But if he disapprove, and they cannot agree, shall transmit the same to the governor, who shall decide. Provided, that in all cases where the parties shall be dissatisfied with the settlement of their accounts, an appeal shall be allowed.

On the 31st of March 1806, an act was passed by the legislature of Pennsylvania, entitled "an act for the more speedy and effectual collection of certain debts due to this commonwealth." The following is a summary of the first ten sections of that act.

Sect. 1. Commissioners appointed with powers to procure copies of deeds and other writings, relating to the real estate of John Nicholson. 2. The commissioners to receive on application, copies of all necessary papers, from the land officers, without fees. 3. To ascertain, as near as may be, the quality and extent of the estate of John Nicholson in each county, subject to the lien of the commonwealth. 4. To average the demand of the commonwealth on the several estates subject to the lien, and make report to the governor, who shall cause the same to be sold, &c. on the payment of the sum assessed on any particular estate by any person claiming an interest therein, the commissioners empowered to convey to such persons the estate or lien thereon. 5. Where the commissioners shall

be authorized to compromise with individuals or the managers of land companies.    6. In what cases the commissioners may purchase in the property for the use of the state.    4th, 5th and 6th sections, repealed and supplied.    7. Commissioners to take oath or affirmation for the faithful discharge of their duties. 8. Their compensation.    9. Empowered to recover by due course of law, books and papers, &c.    10. Commissioners of the several counties prohibited from selling any of the lands of John Nicholson for taxes.

Sect. 11. And be it further enacted by the authority aforesaid, that in any case where the said John Nicholson, in his life time, had or held lands in partnership, or in common with any other person or persons, the said commissioners, or a majority of them, are hereby authorized to cause partition to be made of the said land by writ or otherwise, in order to ascertain the respective interests of the said part owners, as well as the separate interest of the said John Nicholson, and if it shall be necessary to make said partition by writ, in case of disagreement between the parties, the said commissioners or a majority of them, shall be made parties to such writ, either plaintiffs or defendants, and such partition, so made, shall be as available in law, as if the same had been made by the said John Nicholson in his life time, and the costs thereof shall be paid equally by the parties as in other cases, and the said commissioners shall be allowed for their part of such costs in the settlement of their accounts.

Further legislating on this subject, on the 19th of March 1807, an act was passed, entitled "a supplement to an act, entitled 'an act for the more speedy and effectual collection of certain debts due to this commonwealth.'"

Sect. 1. Be it enacted by the senate and house of representatives of the commonwealth of Pennsylvania in general assembly met, and it is hereby enacted by the authority of the same, that the commissioners appointed under the act to which this is a supplement, shall make report of their proceedings to the governor, who, on approbation thereof, shall issue one or more process to the said commissioners, commanding them, or a majority of them, to sell such lands or interest in lands, as the said commissioners may specify in their report as the property of the late J. Nicholson, and in all cases of sales to be

[Lessee of Livingston v. Moore and others.]

made by the commissioners or a majority of them, at least twenty days notice shall be given of the time and place of sale by advertisement in the newspaper printed in the county where the lands respectively lie, if any be there printed, and if not, in the newspaper printed nearest to such county, and also in two papers printed in the city of Philadelphia. Provided, that nothing contained in this section shall operate to abridge the powers of compromise vested in the said commissioners by the fourth section of this act.

Sect. 2. In all cases of sales under this act, the purchaser or purchasers shall pay the amount of the purchase money into the state treasury, and the payment of no part of the purchase money shall be deferred for a longer time than four years, and whenever any part shall be deferred for any length of time within that period which is hereby referred to the discretion of the commissioners, or a majority of them, immediately superintending any sale, such deferred payments shall carry interest from the time of the sale, and shall be secured by bonds given by the purchaser or purchasers with surety, approved by the commissioners or a majority of them as aforesaid, payable to the treasurer of the commonwealth and delivered to the said commissioners or a majority of them at the time of sale, and the said commissioners or a majority of them shall, on the receipt of the bonds aforesaid, deliver to every purchaser a certificate of the property sold to him, the time and place of sale and the bonds received, and shall also deliver into the hands of the treasurer within two months from the time of sale, all bonds received for or on account of such sales, and within the same time make a particular return into the office of the secretary of the commonwealth to the process of the governor of the quantity of land sold, the situation thereof, the price at which it was sold, and how paid or secured, which said process and return shall be carefully registered and filed by the said secretary, who is hereby required upon the application of any purchaser or purchasers, or any person on his or their behalf, on production of the certificate aforesaid and the treasurer's receipt for the consideration of the purchase, to make and execute a deed or deeds to the purchaser or purchasers for the property sold to him or them, as and for such estate as the said John Nicholson had or held the same at the

time of the commencement of the liens of the commonwealth against the estate of the said John Nicholson, which said conveyances or copies of the records thereof shall be prima facie evidence of the grantee's title : provided, that the respective bodies or tracts of land sold under this act shall be subject to the payment of the purchase money thereof.

Sect. 3. The said commissioners or a majority of them are hereby authorized and empowered to expose any body of lands late the property of the said John Nicholson late deceased, which are subject to the lien of the commonwealth, to sale under and by virtue of the process to be issued by the governor as aforesaid, either in gross or by separate tracts as to them or a majority of them may appear most advisable.

Sect. 4. The said commissioners or a majority of them shall have full power to settle by compromise or otherwise with any person or persons who in any manner may allege title to any of the lands late the property of the aforesaid John Nicholson, deceased, on such terms as to them may appear most eligible, and their proceedings therein shall be final and conclusive on the commonwealth : and upon any compromise made with any person or persons, the said commissioners or a majority of them, at the request of the party and upon his or their paying the consideration money into the state treasury, or securing the payment of the same, may and shall execute and deliver an asssignment under their hands and seals of so much of the liens of this commonwealth against the estate of the late John Nicholson, as may be equivalent to the consideration paid or secured to be paid as aforesaid by such party, and from the date of such assignment the whole amount thereof shall be principal bearing legal interest, and the holder or holders of such assignments, or his or their assigns may at any time proceed upon the liens of this commonwealth to sell the lands which may constitute the subject of such compromise.

Sect. 5. If the commissioners or a majority of them should be of opinion that it would be more to the advantage of the commonwealth to purchase any of the property to be offered to sale under this act for the use of the commonwealth than to suffer the same to be sold for a sum less than the estimated value thereof, they, or a majority of them are hereby empowered so to do, and in this, as in cases of sales to individuals, the

commissioners are enjoined to make a special return into the office of the secretary, who shall as in other cases, register the return, which shall vest in the commonwealth all the title to the property so purchased, which the said John Nicholson had therein at the date of the commonwealth's liens, and the lands so purchased shall be disposed of in such manner as shall hereafter be directed by law: provided, that no purchase, either directly or indirectly, shall be made in behalf of the commissioners aforesaid in their own right, nor shall any of the property of John Nicholson be vested in them otherwise than as in trust for the commonwealth.

The succeeding sections have no application to the questions in this case.

The court charged the jury,

1. That the accounts between John Nicholson and the commonwealth, or some of them, were so settled and adjusted, that the balances or sums of money, thereby found due to the commonwealth, were good and valid liens on all the real estate of John Nicholson, throughout the state of Pennsylvania.

2. That the judgments rendered by the supreme court of the state, in favour of the commonwealth, against John Nicholson, also constituted good and valid liens upon all his real estate throughout the state.

3. That the several acts of the general assembly of Pennsylvania, passed on the 31st of March 1806, and on the 19th of March 1807, are not repugnant to, or in violation of the constitution of the United States, or of Pennsylvania; but that they are good and valid laws, and a rightful exercise of the powers of the legislature of Pennsylvania; that the whole law of the case is therefore in favour of the defendants.

The defendants were purchasers of the land for which this suit was instituted under the provisions of these laws.

The case was tried in October 1828, and a verdict and judgment, under the charge of the court, were rendered for the defendants(a). The plaintiffs excepted to the charge of the court,

(a) The very learned and highly interesting charge, delivered to the jury by the honourable Judge HOPKINSON, on the trial of this case in the circuit court of Pennsylvania, will be found in an Appendix to this volume.

on the points stated at large in the arguments, and in the opinion of the court.

Exceptions were also taken during the trial to the ruling of the court in matters of evidence, which also sufficiently appear in the arguments of counsel, and the opinion of this court.

The case was argued by Mr C. J. Ingersoll, with whom also was Mr Taney, for the plaintiffs; and by Mr Binney, and Mr Sergeant, for the defendants.

Mr C. J. Ingersoll, for the plaintiffs.

By the agreement under which this case was tried, both plaintiffs and defendants claim under Nicholson, whose title is admitted, unless divested by the alleged lien and proceedings of the state which create the defendants' title.

For the plaintiffs, it will be submitted, first, that the acts of assembly in question are unconstitutional; secondly, that the state had no lien; and thirdly, that the court erred in ruling certain points of evidence.

1st. The question of constitutionality. By their act of the 13th of April 1782, the legislature of Pennsylvania conferred on Nicholson extraordinary powers and duties, judicial and executive as well as fiscal, by appointing him comptroller-general. 2 Dallas's edition of the Laws of Pennsylvania, 44; 2 Smith, 19. After twelve years service in that office, he was accused of misdemeanour, impeached, tried and acquitted; but resigned the 11th of April 1794. Much precipitate and passionate legislation ensued, with a view of recovering certain debts which he was charged with owing the commonwealth; continued by various provisions through a period of fourteen years. The final acts of 1806 and 1807 ordered confiscation of his large real estates, comprehending several millions of acres throughout the state, worth more than twenty times enough to pay all its alleged demands, and all his private creditors: but unconstitutionally sacrificed by commissioners appointed by these acts, at their arbitrary sales, contrary to the due course of law, and uncontrolled by any court of justice, by proceedings altogether extrajudicial: these large estates produced probably little more than paid the commissioners' charges. The same acts

also order Nicholson's papers to be seized wherever met with, and secured in public office : private and official, they have all been in the state's exclusive keeping ever since. Thus stripped, spoiled by the state of all his possessions and titles, character and credit, and imprisoned by private creditors, but resolved not to surrender estates, which he knew were much more than sufficient to satisfy his debts, always denying that he was in debt to the state at all, Nicholson languished till he died in jail, the 2d of December 1800. His widow and minor children went into exile from Pennsylvania : nor was it till lately that they had the means or the courage to seek judicial redress.

As soon as Nicholson was out of office, an act of assembly of 20th April 1794, (3 Dallas's edition of the Laws of Pennsylvania, 790,) made provision for the settlement of his accounts : but neither this act, nor that of 1792 appointing him to office, asserts any lien on his estate. This was done by the twelfth section of the act of 13th February 1785, 2 Dallas's edition of the Laws of Pennsylvania, 251, which declares that the settlement of any public account by the comptroller-general, and confirmation thereof by the supreme executive council, whereby any balance or sum of money shall be found due from any person to the commonwealth, shall be deemed and adjudged to be a lien on all the real estate of such person throughout this state ; *in the same manner as if judgment had been given* in favour of the commonwealth, against such person for such debt, in *the supreme court.*

The state is supposed to set up three liens against Nicholson. 1. A fiscal lien by treasury settlement. 2. Judicial lien by judgment in the supreme court. 3. A posthumous lien by operation of law on Nicholson's death, insolvent, as is charged.

Whether, as the act of 1782, appointing Nicholson comptroller-general, creates no lien, that of 1785 could superadd such liability to the original contract between him and the state, will not be made a distinct point ; but without waving after thus suggesting it, left for the determination of the court.

The act of the 31st of March 1806, (Bioren's edition of the Laws of Pennsylvania, vol. 8. p. 166,) though entitled an act

for the more speedy and certain collection of certain debts due to the commonwealth, is confined to the debts claimed of Nicholson alone.  It assumes such debts without specifying sum, date, or any other particular.  It also assumes what is called the lien, without specifying whether fiscal or judicial, or when it accrued.  The lien thus assumed, for a debt thus unexplained, is extra-judicially put in force: for though by the fourth section the sheriffs are appointed to sell the lands, and directed to do so according to due course of law; yet their mandates issue from the governor instead of any court of justice, and the whole proceedings are subject to no judicial control whatever. The supplemental act of the 19th March 1807, (Bioren's edition of the Laws of Pennsylvania, vol. 8, p. 208) removes every vestige of judicial proceeding and control.  The sheriff's agency is dispensed with.  Nothing is said of due course of law; but the commissioners appointed by the act are arbitrarily to realize the avails of the lands, without the agency or control of any court or officer of justice.

Granting the state lien to be, what the act of 1785 declares, like a judgment, may it be thus enforced?  The state contends that these acts of assembly do but accelerate and invigorate the remedy, by provision for putting the lien in force.  The plaintiffs insist that they violate the right.  It would be as lawful for the party state to enforce its lien by military power.  The state's argument, if it prove any thing, proves too much; for it maintains that this lien might be enforced by any means whatever.  The plaintiffs submit that, whatever the proceedings be, however the due course of law may be changed, it cannot be dispensed with.  The proceeding must be judicial.  Though the state has not specified what lien it relies upon, yet the ninth section of the act of 1807, by assuming the 20th December 1797 as the date, sufficiently proves that its reliance was on the fiscal lien by treasury settlement of that date.  Granting either lien, fiscal or judicial, the plaintiffs insist that it can be only realized by judicial execution.  The debtor party cannot be deprived of redress by due course of law, for any complaint he may make.  Unquestionably he is so by these acts.  Their provisions are superfluous. The same power that can enact, may dispense with them. They are the mere machinery of confiscation.  If they are con-

stitutional acts, the same power might have dispensed with that machinery, and enacted by one simple provision, that the lands of Nicholson belong to the state. Nor was this machinery even designed for his benefit, but merely to sell the lands, profitably, for the advantage of the state. Due course of law, as that phrase has been understood ever since Magna Charta, means the ancient and established course of law, the established course of judicial proceedings. 2 Inst. 60, 61; 1 Black. Com. 138, 139. It may be said that Coke, in the passage referred to, means criminal law; but this court put no such limitation on the phrase, but understand it to mean all judicial proceedings whatever, in the case of the Bank of Columbia v. Okely, 4 Wheat. 244.

There were three contracts between the state and Nicholson: 1. That, by the acts of 1782 and 1785, appointing him comptroller-general, and fixing his liability in case of indebtedness, which was to be a lien like a judgment in the supreme court; 2. That, by the warrant for the land, which was a grant that estops the state from resuming it; 3. By the agreement for judgment entered in open court. By each and all of these contracts, the state bound itself to abide by a lien after the manner of a judgment; that is, an incumbrance to be judicially realized according to the common process used in due course of law; issuing from a court of justice always open to the complaints of all parties. This is the vital principle of all the three contracts: to be under the jurisdiction of a court of law, empowered to redress any complaints.

The twelfth section of the act of 1785 is express, that the lien shall be in the same manner as a judgment in the supreme court: in other words, that it shall be like a judgment, which is an incumbrance by itself inoperative, until put in action by the execution which crowns it. Wayman v. Southard, 10 Wheat. 23. Execution is necessary for the perfection of judgment, and consequently, indispensable for the beneficial exercise of jurisdiction. It is putting the sentence of the law in force. 3 Black. Com. 412. In like manner, the agreement confessing judgment, ex vi termini, imports liability to judicial execution; not executive, arbitrary, or contrary to the usual course of judicial process. It may be said that the language of the act of 1785, giving a lien like a judgment in the supreme

court, means nothing more than an incumbrance co-extensive with every county in the state. But this interpretation was rejected in the circuit court, for the obvious reason that a prior paragraph of the same section of the act provides in terms for that purpose, which therefore would not be repeated. Both the fiscal and judicial liens are but executory, *jus ad rem*, not *in re*, requiring other process to execute them. There is a right to lien, but not to execution. The obnoxious acts give execution; not such as follows judgment in due course of law, but extraordinary, arbitrary, executive, extra-judicial, and therefore unconstitutional execution of the lien.

Such laws it is submitted,

1. Impair the obligation of contracts, contrary to section 10, article 1, of the constitution of the United States, and they impair contracts, contrary to section 17, article 9, of the constitution of Pennsylvania: for these acts, by contravening the latter constitution, avoid all the difficulties into which this court was thrown by the alleged distinction between a contract and the obligation of a contract. 12 Wheat. 239, 240, 241, 242, 256, 257, 258, 259.

2. They take property and apply it to public use without just compensation, contrary to section 10, article 9, of the constitution of Pennsylvania.

3. They deprive of remedy by due course of law for injury done, contrary to section 11, article 9, of the constitution of Pennsylvania.

4. They violate the right of security in person and papers from unreasonable searches and seizures; contrary to section 8, article 9, of the constitution of Pennsylvania; and the fourth amendment of the constitution of the United States.

5. They violate the right of trial by jury; contrary to section 6, article 9, of the constitution of Pennsylvania, and the seventh amendment of the constitution of the United States.

Lastly. They violate the fundamental principle of social and political compact, which withholds from a body politic, as from all its individual members, the power to judge in its own cause, and enact exceptive laws, in particular instances, in derogation of the common law.

Thus the obnoxious acts violate, 1st, universal law or common justice; 2nd, the constitutional or organic law of this fe-

deral union of the states; 3d, the constitutional or organic law of the state of Pennsylvania. In other words, they violate natural, federal, and municipal law.

The state rests on a lien in the same manner as if judgment were given in the supreme court. Manner comes from *manier*, to handle or execute. It is the way of executing. To be taken in the manner is to be caught in the execution of an offence. The circuit court considered this phrase a mere pleonasm. But that would violate the first rule of interpretation, which is to give to every word of a law, more especially to every substantive phrase, some meaning. The phrase in question obviously means a lien like a judgment. The mere word lien would do so by itself; that is to say a binding but inert incumbrance, to be realised by further and final process. According to the argument of the charge itself, the intention was to make the debt secure by the lien, the settlement being conclusive evidence of the debt, but to be recovered and collected in the ordinary way of a suit, judgment and execution. No attempt was made during ten years, from 1796 to 1806, to enforce the lien. But the judicial lien was proceeded upon in the manner of a judgment by judicial exemption. There were however numerous individual executions forestalling it. Whereupon, the acts of 1806 and 1807 undertook to realize the fiscal lien, because it preceded the individual executions.

That a state may be party to a contract with another state, or a corporation, or one or more individuals, and dealt with accordingly in courts of justice, is the established and familiar law of this country. Fletcher v. Peck, 6 Cra. 132, 2 Cond. Rep. 308 ; New Jersey v. Wilson, 7 Cra. 166, 2 Cond. Rep. 457; Green v. Biddle, 8 Wheat. 92; Providence Bank v. Billings, 4 Peters, 514; Sturges v. Crowninshield, 4 Wheat. 197, 4 Cond. Rep. 409.

It is also as well settled that a contract is a compact or agreement between two or more parties, whether communities or individuals, either executed or executory. Fletcher v. Peck, 6 Cranch, 136; Green v. Biddle, 8 Wheat. 92; Ogden v. Saunders, 12 Wheat. 297; Farmers and Mechanics Bank of Pennsylvania v. Smith, 6 Wheat. 132; Serg. Const. Law, 352 ; Crittenden v. Jones, and Glascock v. Steer, 5 Hall's Law Journ. 514 ; Vanhorn v. Dorance, 2 Dall. 304; Dash v. Van Kleeck,

7. Johns. 490; Pickett's Case, 5 Pickering, 65.   To be sure it must be a contract concerning property, not a mere civil contract, such as that of marriage.   Dartmouth College v. Woodward, 4 Wheat. 637, 644, 682.   But even to forbear is as much a contract as to affirm ; and it has been decided that acquiescence makes a contract.   Western University of Pennsylvania v. Robinson, 12 Serg. and R. 29.   Contracts are constructive as well as specific.   Ogden v. Saunders, 12 Wheat. 317.   Each party acquires a right in the other's promises, whether express or understood.   Etymologically, contract means any agreement that draws two or more together.   In common understanding it means any bargain.   In law it means any agreement on good consideration to do or forbear any lawful act.   Com. on Cont. vol. 1, p. 1; Powell on Cont. 234; 2 Black. Com. 442.   According to the civil law it is an agreement which gives an action to compel performance.   Wood's Institutes of Civil Law, 206; 1 Rutherforth, 204, ch. 13 ; Grot. b. 2, ch. 12 ; Paley, vol. 1, ch. 6, p. 145.   Existing law, whether statute, common or customary, affecing a contract in its obligation, construction, or discharge, is always part of a contract, though not expressed to be so.   Camfranque v. Bunel, 1 Wash. C. C. Reports, 341; Ogden v. Saunders, 12 Wheat. 291.   All usages are no more than constructive contracts.   The whole common law is little else ; the land titles of Pennsylvania by warrant and survey also.   Nicholson contracted with the state that his lands should be bound by a lien.   The state contracted with him that the lien should be like a judgment.   Such was the contract by the act of 1785, by the warrant of 1794, and by the judgment of 1797.   All these were agreements for valuable consideration, concerning private property, like the contracts held sacred and not allowed to be impaired in the various cases before cited.   If land is granted by a state, its legislative power is incompetent to annul the grant.   United States v. Arredondo. 6 Peters, 738.

Such being the contract, and the law of contracts without provision in this instance for enforcing it, may that be done extra-judicially ?   Such enforcement could not have been in Nicholson's contemplation when he entered into the contract : nor will the law impute to him an anticipation of any unusual, much less extra-judicial execution..

There is a class of laws which are extraordinary, exceptive and prepotent from the necessity of things ; such as laws of revenue, limitation, insolvency, usury, divorce, and the like. Perhaps all contracts for public office are of this class, as far as respects official salaries; though it is not altogether certain that by the act of 1785 the state could reduce the salary given to the comptroller-general by the act of 1782. This principle is questioned by Chief Justice Marshall in the Dartmouth College case, 4 Wheat. 694. For argument's sake we can afford to concede, without endangering Nicholson's case, that the state by subsequent acts might increase his duties, and reduce his salary. But the lien on his private estate could not be affected without his consent, nor otherwise enforced than as originally agreed.

It is very clear that the acts in question impair the contract, if there was one. To impair, etymologically from *impar*, is to render unequal, to make worse ; and unquestionably these acts rendered Nicholson's estate worse. According to adjudications, whatever prejudices the validity, construction, duration, mode of discharge, or even evidence, of an agreement, in any manner or degree, impairs the contract, Ogden v. Saunders, 12 Wheat. 256, 257. Any law which lessens the original obligation impairs it, 12 Wheat. 337. The state will insist on state necessity and state power, its eminent domain. The question is whether any necessity will justify the exercise of extra-judicial power to enforce a contract which stipulated for the due course of law to enforce it. The acts in question, though rapacious, exceptive, arbitrary, unjust, impolitic and odious, may nevertheless be constitutional. But suppose a private creditor to have got such a law enacted for the collection of his lien debts, would not the enormity of that law flash conviction of its unconstitutionality ? The state must show its superior power, on the tyrant's plea of state necessity, to enact such a law. Yet it is against this very power, dreadful in states, but never to be apprehended from individuals, that the constitutional provisions were intended to guard states that are not omnipotent even in the regulation of their revenue laws, but restrained by constitutional barrier. Laws of escheat, taxation, attachment, revenue, and the like, though summary, and contrary to the course of common law, for the more speedy and effectual recovery of certain claims, yet are always general in

their operation, uniform in their provisions, and subject to judicial control. It is not intended to deny the power of states to modify remedies. Sturges v. Crowninshield, 4 Wheat. 197, 200. The power to alter the modes of proceeding in suits at common law includes the execution of their judgments; Weyman v. Southard, 10 Wheat. 47 ; and a general superintendence over them is within the judicial province. But even an act of limitation barring passed decisions would be void. Society v. Wheeler, 1 Gall. 141. An act annulling a judgment would be void. Dash v. Van Kleeck, 7 Johns. 490. And in the same case it is said by Judge Thompson, that after the judgment of a court, legislation is incompetent to impose new rules of law. 7 Johns. 496. The distinction between remedy and right so equally divided the judges of this court in the case of Ogden v. Saunders, 12 Wheat. that it would be hazardous to attempt to define it. But even Messrs Clay, Livingston, and the other gentlemen who argued that case in contradiction to the argument now submitted, concede that all the sovereign power of states can be executed only by general, impartial and prospective legislation, not affecting vested rights or past transactions. The extinction of the despotic and iniquitous principle of retrospective legislation was the great object of the constitution; and the supposed distinction between right and remedy is often without foundation, as for instance, a law forbidding the institution of an action, though it seems to act on the remedy, annuls the right. The meaning of the term obligation is well explained by a recent French author of great authority—Toullier on the Civil Law, vol. 1, p. 84. If a state, undertaking to modify a particular law, in effect extinguishes the obligation, this would be an abuse of power; 12 Wheat. 352: nor does power to vary the remedy imply power to impair the obligation. Of this leading but contradictory case it may be said, 1. That all its argument and illustrations are distinguishable from Nicholson's case, because they look to laws that are general and not exceptive ; 2. All the judges agree that ex post facto laws which abolish judicial action are unconstitutional; and 3. That even general laws, such as acts of limitation, are unconstitutional if they impair prior contracts. The cases of Fletcher v. Peck, the Dartmouth College, Sturges v. Crowninshield, and Ogden v.

[Lessee of Livingston v. Moore and others.]

Saunders, are, in principle, supporters of the argument now submitted.

Remedy, as defined by lexicographers, means literally, to cure. Blackstone speaks of the remedial part of a law. 1 Black. Com. 55. Right means just claim to any thing. Thus, in the language of the law, remedy is always used metaphorically. And the acts in question are not remedial; for they do not cure. They rather affect the right to judicial process, which they take away. Nicholson's contract provides that the process against him should be judicial, or rather that there should be no proceeding against him but by process. The act of 1785 gives lien, without providing how it should be enforced. Liens are always enforced by process. But the obnoxious acts, instead of supplying a defect of process, abrogate all process whatever, and substitute a commission which is equivalent to confiscation. They might as well have ordered the governor or the militia to seize the lands, or have opened a land office to sell them. Granting that the acts in question are even remedial, yet they are void because they abolish judicial remedy. Perhaps the legislature might erect new tribunals for the more speedy and effectual recovery of the debts said to be due by Nicholson. But they could not erect a tribunal to proceed extra-judicially. Should a state be so insane, says Chief Justice Marshall, 12 Wheat. 351, as to shut its courts, would this annihilation of remedy annihilate the obligation of the contract? Granted, that by general legislation the usual modes of process may be altered or abolished. But the power of a state to modify remedies does not authorize the substitution of extra-judicial proceedings instead of due course of law, even by general provision. Suppose the state has judgment against an individual, could an act of assembly authorize the courts of justice to dispense with all the established modes of proceeding, and to realize the debt by arbitrary execution? The proceedings in question are wholly unlike the established law of Pennsylvania. The act of 1700 (1 Smith's Ed. Laws of Penn. p. 7) carefully regulates the methods of execution; and the arbitration act of 1806, sec. 11 (4 Smith's Ed. of Laws of Penn. p. 329), carefully conforms to the provisions of the act of 1700. Courts martial, prevotal courts and all special commissions to try even criminals, at

least profess to proceed judicially, even though they differ from common law. It can hardly be said that the acts in question are revenue laws. But if even they were, the summary process authorized by acts of congress for the more speedy and effectual collection of the national income is uniformly and thoroughly judicial in its character. Act of 15th May 1820, 3 Story's Ed. Laws of the United States, sec. 4, p. 1791. Such was also the old revenue system; Act of the 14th July 1791, sec. 16, 1 Story's Ed. of Laws of the United States, p. 550. Such was the system of the late war taxation; Act of 1815, sec. 33, 2 Story's Ed. Laws of the United States, p. 1466. Such are all the tax laws of the state of Pennsylvania. It is believed that no instance can be cited of a stretch of legislative power by vigour beyond the law occurring in any of the United States such as the acts in question.

Nor are they countenanced by any adjudication. The case of Stoddard v. Smith, 5 Bin. 355, on which the circuit court relied, was that of a prior and a general act, not interfering with any judicial proceeding. Such also was the case of Emerick v. Harris, 1 Bin. 416, sustaining the arbitration law, on the ground that though it postpones it does not take away trial by jury. In the Bank of Columbia v. Okely, 4 Wheat. 235, a prior and a general law authorizing the bank to issue summary executions against its debtors was sanctioned by this court on the principle that such was part of the original contract. This case is fully explained by Chief Justice Marshall in Ogden v. Saunders, 12 Wheat. 342. The Providence Bank v. Billings, 4 Peters, 514, determined that a state may tax a bank which it had chartered, because the state power of taxation is part of the original contract. Jackson v. Lamphire, 3 Peters, 280, decides that a general act authorizing commissioners to settle all disputes in one county is not unconstitutional. But in the opinion of the court pronounced in that case it is said that even recording and limitation acts, though within the discretion of a legislature, may be so unreasonably enacted as to require a judicial check. The difference is plain between this New York and this Rhode Island case, and the case in question : but the very circumstance of their being contested proves with what extreme jealousy all exceptive and ex post facto laws are viewed in courts of justice. There are several

cases in the Pennsylvania Reports which may be referred to as countenancing the acts against Nicholson: but upon examination every one of them will be found distinguishable. Underwood v. Lilly, 10 Serg. & Rawle, 97; Bambaugh v. Bambaugh, 11 Serg. & Rawle, 192; Barnet v. Barnet, 15 Serg. & Rawle, 72. By posterior act, the legislature might have raised an administrator to Nicholson's estate without requiring security, as usual; might have directed the sheriff to sell, dispensing with the ordinary methods and stages of execution; might have substituted the governor's warrant for the judicial writ of execution. But however the process might have been changed, it could not be annulled. The contract required judicial proceeding, and could be satisfied with none other. Whenever an individual enters into a contract, he assents to abide by the administration of justice common to the jurisprudence of his country, but to none other. 12 Wheat. 285.

It is thus supposed to be established: 1st. That there were the contracts of 1785, 1794 and 1797. 2d. That they were impaired. 3d. By extra-judicial enforcement.

In connexion with this position it will be convenient to consider the last; to wit, that the acts in question violate the fundamental principles of universal justice. The first and great adjudication on this subject, is Vanhorn v. Dorrance, 2 Dall. 304, which determines that a party state cannot by legislation alter its contracts; that it is not competent for the legislature of such state to judge of the necessity of altering such contracts; that no state can take away private property by special and individuated legislation; nor when private property is taken, by even general legislation, can the legislature settle the compensation to be allowed, which must be referred to the impartial umpirage of the judiciary. There is an implied contract between every state and every individual citizen of it, that all laws contrary to natural reason or justice, are void. The English cases on this subject are collected in 1 Kent's Com. 420.

In England, where there is no written constitution, acts of parliament contrary to natural equity, such as make one a judge in his own cause, are void. Day v. Savage, Hob. 87. Now there is no difference between the case of the individual and that of the state, except that as the state is much more formidable, a multo fortiori, should the judiciary prevent its

attempts to judge in its own cause. No government of laws is authorized to enact exceptional provisions, striking at one citizen-or one family, and depriving them of the benefit of the law common to all the rest. The sovereign people commit no such trust to a legislature. A legislature would be the most dangerous of all despotisms if it may single out an individual, as in this instance, post factum and post·mortem, depriving his family of the law common to all the rest of the community, but closing the courts of justice against that family alone. The first principle of the social compact is, that no one of its members shall do himself justice, but seek it through the public authority with which its dispensation is deposited: hence the maxim, that every citizen is under the safeguard of the law; Toullier, vol. 1, p. 168; and is it not the worst conceivable violation of this principle, for the society in its dispute with an individual to undertake to regulate it itself, without suffering the interposition of the judiciary? The state, on this occasion, in fact, proceeded not in its sovereign capacity, but as a common creditor, and usurped all the powers, legislative, judiciary, and executive, which in every well regulated government are always kept distinct. It is high time to restore the true sense according to the plain language of the constitution, prohibiting all ex post facto legislation, instead of confining it to criminal cases, as has been generally done, owing to an early but total misapprehension of the law. The provision against ex post facto laws is twice repeated by the constitution of the United States; first, to prohibit congress, and, secondly, the several states, from the enactment of such laws. It is also in the constitution of Pennsylvania: the restriction on congress obviously embraces both criminal and civil cases; bill of attainder being used for the one, and ex post facto laws for the other. The clause restricting the states expressly comprehends *all* expost facto laws as well as *any* bill of attainder. And the context shows that this clause is dealing with unlimited prohibition. The states surrender the whole power without reserve. The constitution establishes the general principle of the inviolability of contracts. Ogden v. Saunders, 12 Wheat. 312. The universal law was so before the constitution, which is but declaratory of it. 12 Wheat. 303, 304; Federalist, No. 44. What right then has any judicial magistrate to put upon these provisions of the constitu-

[Lessee of Livingston v. Moore and others.]

tion a limitation not to be found in either the letter or the spirit? The mischievous influence of Blackstone's unsupported dictum, for which no authority can be vouched, but which is contrary to all English law, suggested the ill considered notion of judicial interpolation that has gained ground in this country. Legislation cannot be retroactive, for then it becomes adjudication.   To regulate the past is judicial, to regulate the future is legislative. Toullier, vol. 1, sec. 1, p. 18.   It is a first principle of the jurisprudence of all free people, having written constitutions, that legislation must be prospective and general, not retrospective or indiiduated.   1 Toullier, 96; Montesq. Esp. de Loix, liv. 11, ch. 6, liv. 6, ch. 5.  A Turkish firman, or Russian ukase, by which a community or individual determines and executes his own cause, without judicial intervention, would be contrary to the general sense of mankind.   The instances of laws which are void, as against common right, mentioned in the case of Calder v. Bull, 3 Dall. 388, are laws punishing innocent actions, violating existing laws, impairing private contracts, making a person judge in his own cause, taking property from one and giving it to another: authority to make such laws is not among the powers intrusted to legislatures. They cannot revoke their own grants.   Terret v. Taylor, 9 Cra. 45; United States v. Arredondo, 6 Peters, 728.   Even a constitutional power unreasonably exercised, this court has declared would be void.   Jackson v. Lamphire, 3 Peters, 280. Whether an act of legislation must be contrary to the constitution as well as first principles, and whether *all* ex post facto legislation of the states is void, are questions upon which the federal judges have not been perfectly agreed.   Judge Chase affirms these positions; Judge Iredell denies them in Calder v. Bull, 3 Dall. 388, 389; Judge Patterson's argument in Vanhorn v. Lorrance, strongly implies his agreement with Judge Chase, with whom Chief Justice Marshall agrees; indeed, it appears to be the judgment of the court, in Fletcher v. Peck, 6 Cra. 132, 133, 135.   It is denied by Judge Washington in Beach v. Woodruff, Peters's C. C. Rep. 6; and in Satterlee v. Matthewson, 2 Peters, 413: yet he appears in principle to acknowledge it in Ogden v. Saunders, 12 Wheat. 266, 267.   In Fletcher v. Peck, 6 Cranch, 143, Judge Johnson strenuously asserts, that the constitution of the United States forbids all ex

post facto legislation, civil as well as criminal; as he does again in 12 Wheat. 286, and in his elaborate note in the appendix to 2 Peters, 281.  The same ground is most ably occupied by the supreme court of New York in Dash v. Van Kleeck, 7 Johns. 493, 501, 509; and in Stoddard v. Smith, 5 Bin. 370, Judge Brackenridge says, that the notion of confining ex post facto to criminal laws, is merely American.  Certainly such is not the language of the constitution, nor the spirit, the reason, or the policy.  At least, when states are parties to a contract, they ought not to be permitted to enact ex post facto laws concerning it.  The supreme court of Massachusetts in a late case have added an able argument to their judgment against it.  Picquet's Case, 5 Pick. Rep. 65.

The acts in question take private property, and apply it to public use, without just compensation; and for injury thus inflicted, they refuse remedy according to due course of law.  It is the common law of all nations, that private property cannot be taken by an act of state, without individual consent or judicial umpirage.  Vanhorn v. Dorrance, 2 Dall. 314; Picquet's Case, 5 Pick. 65; Pickering v. Rutty, 1 Serg. & Rawle, 511; Hallam's Constitutional History, 36.  In France the charter requires indemnity to be paid before the property is taken.  In no country, it is submitted, can even a tax be imposed upon one individual alone.

The acts violate the right of trial by jury; any process to enforce the lien would have called in the heirs, who might have pleaded payment, release or satisfaction, which would have been tried by jury.  The court had power, and it is every day's practice, to direct issues to try facts after judgment.  Wherever there is a court of chancery, that might have interposed.  But in Pennsylvania there is no such court, though its principles are recognized and administered.  Pollard v. Shaffer, 1 Dall. 214; Ebert v. Wood, 1 Bin. 217; Murray v. Williamson, 3 Bin. 135; Jordan v. Cooper, 3 Serg. & Rawle, 578.  The charge denies that there was any fact to try, or that Nicholson's property suffered for want of jury trial.  But it is submitted that the state might have been compelled to prove as a fact, how much Nicholson remained indebted, if any thing.  Legal representatives, creditors, terre-tenants, might have applied to the courts, on motion, to question the lumping sales, arbitrary compromises, compulsory

partitions, extravagant charges, and other impositions which are inflicted by the obnoxious acts. The heirs of Nicholson contend, that, on a full settlement of accounts, he owes her nothing. Yet all his estates were confiscated without satisfying her alleged demand, though it is said that there was no question to try, nor any injustice to complain of.

By his contract with the state, Nicholson was entitled, not merely to judicial enforcement of the lien, but to the established methods of execution. The common law, vouchsafing land from execution, was repealed in Pennsylvania as early as 1705, by a statute which makes many careful and tender provisions to protect debtors from harsh and hasty proceedings. This long established law is familiar and dear to the people of that state, and must have been contemplated by both parties when this lien was arranged. 1 Dallas's Laws of Pennsylvania, 67; 1 Smith's Laws of Pennsylvania, 57. Every execution, it is expressly provided, shall be like the English elegit. Inquisition and condemnation are indispensable. The charge calls this a boon, which the state might revoke at pleasure, and asks who suffered for the want of it in this instance. If it is in the contract, that question does not meet the difficulty, though it is easily answered. Nicholson's family and creditors, and the state, all suffered by its extra-judicial confiscation of his lands. If, instead of being sacrificed at commissioner's sales, they had been sold by due course of law, with all its benignant delays and methods of execution, with opportunity of applying to court to regulate them, and of writ of error to the highest court, there was property enough to have paid all that the state or private creditors demanded of Nicholson, and to have left a principality for his family.

Sales in mass, and not by parcels, as these acts require, are contrary to the established practice of Pennsylvania. Rowly v. Webb, 1 Bin. 61; Ryerson v. Nicholson, 2 Yeates, 516.

By the acts in question the commissioners were empowered to average, compromise, seize and sell all the lands at any sacrifice, buy at their own sales, compel partition, seize all Nicholson's private papers wherever found, the asylum company are compelled to give up his shares, and the commissioners are stimulated by a bounty of ten per cent on all the confiscations. An act of legislation assumes that an individual

[Lessee of Livingston v. Moore and others.]

is indebted, assumes a lien for the debt, decrees confiscation of all his estates, enacts a title to purchasers, and forbids all judicial revision. The second section of the act of 1807 declares that the proceedings thus consummated, shall be but prima facie evidence of the grantee's title. It is a title by forfeiture, the infirmity of which is acknowledged by the very act of its creation, which invites judicial ascertainment. But that act excluding all direct means of such 'ascertainment, none other is left but such as the present action, to determine collaterally the validity of the acts of assembly, thus shown to be unconstitutional and void.

2. It is denied that the state had any lien against Nicholson, or that he was indebted to it at all; to prove which, his family relied on the treasury books and the following acts of assembly, to show that his accounts remained unsettled when he died in the year 1800, viz. Act of 20th April 1794, 3 Dal. Laws of Penn. 790; Act of 4th April 1796, sect. 12, 4 Dal. Laws of Penn. 66; Act of 5th April 1797, sect. 1 and 8, 4 Dal. Laws of Penn. 175; Act of 4th April 1798, sect. 1 and 6, 4 Dal. Laws of Penn. 268; Act of 11th April 1799, sect. 4 and 7, 4 Dal. Laws of Penn. 488.

Notwithstanding these provisions, those of the acts of 1782 and 1785, and the exclusive keeping of all Nicholson's papers, of which the state possessed itself, there never was a legal settlement of his accounts, which remain open on the treasury books to this day, and no one can tell upon what settlement the state relies, whether fiscal or judicial. The first judgment of the state, entered the 18th December 1795, was obtained in a suit brought before Nicholson was out of office, in which no execution ever issued, and which expired for want of revival. The fiscal settlements, dated in 1796, are all on stock balances, carried to new accounts, without any settlement in money, as the law requires. They are, therefore, but liquidations of particular accounts, and not a balance of all the respective demands between the parties, struck in money. The agreement of attorneys, by which the judgment was confessed in 1797, stipulates for future settlements, which precludes the idea of actual settlement. The question then is, whether, and how the state got the lien which it assumed.

Lien is a privilege strictissimi juris, a preference, hold or

[Lessee of Livingston v. Moore and others.]

incumbrance, in the nature of a judgment, not favoured in law, nor to be extended by construction. It is dormant, cautionary and incapable of activity, till put in force by another impulse. It is not specific like a mortgage, jus in re, but general, merely ad rem. It does not levy, dispossess or put in possession, and has none of the properties of execution. Gibbs v. Gibbs, 1 Dal. 371; Blair v. The Ship Charles Carter, 3 Cranch, 332; Thellusson v. Smith, 2 Wheat. 396; Conard v. The Atlantic Insurance Company, 1 Peters, 442. Liens, being in derogation of common law, are to be construed strictly, and enforced literally. With respect to them, form is substance. The twelfth section of the act of 1785, 2 Dal. Laws of Penn. 251, requires that in order to constitute a lien, there must be, 1, debt; 2, settlement; 3, by the proper officers; 4, in the prescribed manner; 5, with notice to the debtor; 6, the whole of whose accounts must be settled; 7, and the balance struck in current money; 8, that balance reported to the executive; 9, and entered at large in the treasury books. Not one of these requisites can be shown in the alleged settlement.

The difficulty the plaintiffs have to contend with here is not construction of the various provisions of the acts of assembly, which all speak a clear and satisfactory language, but an adverse decision of the supreme court of the state in the case of Smith against Nicholson, 4 Yeates, 6, which decision the circuit court adopted as right in itself, and binding the judgment of that court, even though wrong. It was an abstract question, stated and submitted by agreement of parties, to which the legal representatives of Nicholson were not a party; nor was it determined in the highest court of the state, which at the time of that decision was the high court of errors and appeals, since abolished. It would not therefore be binding even in the courts of the state; Bevan against Taylor, 7 Serg. & Rawle, 401. In a controversy between a state and one of its citizens, a court of that state should not deprive him of the benefit of the revision of the supreme court of the United States, provided the case be such as to give the latter jurisdiction. If the laws in question should be deemed invalid by this court, it cannot surrender its judgment to that of the state court. The series of its adjudications on this subject is as follows: M'Kean v. Delancy, 5 Cranch, 32; Mutual Assurance Society v. Watts's Executors, 1 Wheaton, 290; Ship v. Miller, 2 Wheaton,

325; Thatcher v. Powel, 6 Wheaton, 127; Elmendorf v. Taylor, 10 Wheaton, 159 ; Jackson v. Chew, 12 Wheaton, 162 ; Inglis v. The Trustees of the Sailors' Snug Harbour, 3 Pet. 127 ; Henderson v. Griffin, 5 Pet. 155 ; Cathcart v. Robinson, 5 Pet. 234 ; Taylor v. Thompson, 5 Pet. 368; Hinde v. Vattier, 5 Pet. 401 ; Ross v. M'Clung, 6 Pet. 283 ; Green v. Neal, 6 Pet. 291.

The principles to be extracted from all these cases are, that they are binding only when they establish general rules of property, perhaps of evidence, adjudged in the highest state courts, and being, like the common law or acts of assembly, uniform and universal in their operation. But though binding they are not conclusive. This court is to examine and judge for itself. If the courts of the United States surrender their judgment to those of the states, it is a concession of vast amount. Respect is due, uniformity is desirable ; but submission would take from the courts of the United States their supremacy and usefulness. Even state legislation has never been suffered to change the practice of the federal courts. Wayman v. Southard, 10 Wheaton, 1. The case of Smith and Nicholson not having been adjudged by the highest court of the state, not establishing any general rule of property or of evidence, and not adjudging the question presented by this case, is therefore not a binding authority. In that case the question of settlement was taken for granted, together with that of notice ; and all the other positions contested in this case, except whether the governor's sanction is indispensable to him. The general construction and operation of the act of 1785, in connection with all the other acts of assembly which tend to explain it as now submitted, was never presented.

If, notwithstanding these views, this court should uphold the lien, it becomes necessary to inquire whether it had not expired before the acts of 1806 and 1807 assumed its existence. The judgment of 1795 expired in 1802, for want of scire facias to revive it. The judgment of 1797 is inconsistent with the fiscal lien of 1796 ; for can there be two liens for the same debt ? lien is a thing incompatible with another title, it is a single hold or incumbrance excluding all other rights of other claimants, and all other claims of the same claimant, to the thing bound by the lien. A lien claimant loses his lien by let-

[Lessee of Livingston v. Moore and others.] .

ting go of it for an instant, or by taking other security for the debt. Kaufelt v. Bower, 7 Serg. & Rawle, 73 ; Cranston v. The Philadelphia Insurance Company, 5 Bin. 540 ; Ramsey v. Allegre, 12 Wheaton, 612 ; Collins v. Ongley, 3 Selwyn, N. P. 1163. There may be double security and several remedies, as bond and mortgage, or covenant and distress; Gordon v. Correy, 5 Bin. 552 ; Bantleon v. Smith, 2 Bin. 146 ; but there cannot be two liens for the same thing. It is not a question of extinguishment but of election. The state was bound to choose and did choose, relying on the lien by the judgment of 1797, which gave a plain and adequate recourse, instead of the fiscal settlement of 1796, which was involved in doubt and difficulty. The fiscal lien never was set up until several years after Nicholson's death, when it was found that the lien of the judgment proved abortive. The only reliance was that judgment, and that was suspended or satisfied in law by several of the executions under it ; one of which was staid by the plaintiff's order, another not executed by order of the comptroller-general of the state, and a third levied on real estate which was subjected to inquisition, condemnation, and venditioni exponas, yet outstanding. The general rule of law and reason under such circumstances is that the debt is discharged. Little v. Delancy, 5 Bin. 267. The whole liability is transferred to the sheriff.

It may be moreover alleged that the state has a lien by Nicholson's death insolvent. But first, there is no proof that he died insolvent; and secondly, if he did, all debts due to the commonwealth of Pennsylvania are postponed to all other debts by the fourteenth section of the intestate act of 1794. 3 Dal. Laws of Pennsylvania, 357 ; 3 Smith's edition of the Laws of Pennsylvania, 145. The lien was but a debt, in which case it has been settled by the courts of that state, that it must take its place after certain other debts. Moliere v. Noe, 4 Dal. 450 ; Scott v. Ramsey, 1 Bin. 221. There were many judgments and liens of individual creditors preceding those of the state, which by law outrank it ; and indeed it was to forestall those very creditors when their advantages were ascertained, that the legislature recurred to the fiscal lien of 1796, which the acts of assembly assume.

Lastly. There are four exceptions on points of evidence.

[Lessee of Livingston v. Moore and others.]

1st. The journal of the house of representatives of Pennsylvania was offered to prove that the same sums and the same stock as claimed under the alleged fiscal lien were claimed in the action of trover.   2d. The same journal was offered to show the report of a committee to the same effect.   3d. The appendix to another report of a committee was offered to show that Nicholson's accounts were unsettled.   All this testimony was rejected.   Office registers, church registers, and parish registers are received in evidence as public documents made by disinterested persons.   The books of any public corporation are evidence of its acts and proceedings.   Owings v. Speed, 2 Stark. Evid. 177, 5 Wheat. 420.   Why, then, are not the acts of the constituted authorities of a state evidence against it ?  The state took defence in this case; and can it be a well founded objection, after several laws of the state were read in evidence, that the proceedings of committees of the legislature were not also evidence, because they had not become enactments?   The case of Kelly v. Jackson, 6 Pet. 630, is supposed to settle this point.

The ledger of the treasury was offered to show that the accounts between the state and Nicholson remain unsettled, and rejected on the ground that the ledger is not a book of original entries, and that the accounts are incomplete.   But as the state was defending its grantees the defendants, proof from any book or account kept by the officers of the state, whether original or not, and however incomplete, would be good evidence against the state.   The error in ruling this point must be imputed to a misapprehension that the ledger was offered by the state, instead of being offered against it.

Mr Binney, for the defendants in error, stated that Mr Sergeant and himself appeared in support of the judgment of the circuit court, by the appointment of the governor of Pennsylvania, under certain resolutions of the legislature.

The case in that court was an ejectment by the heirs of John Nicholson for two tracts of-land in Franklin county, the title of which was admitted to be in them, unless divested by certain alleged liens and proceedings of the state of Pennsylvania.   By agreement the proceedings by the state were to be set up as a defence, and the question whether the title of

John Nicholson and his heirs was divested by them, was to be brought forward and submitted on its merits.   The case therefore turned upon this defence, the history of which may be briefly stated.

In March and December 1796, certain accounts between the state and John Nicholson were settled in the department of accounts, by which he was found a debtor to the state in large amounts.   On these settlements the state claimed to have a lien on John Nicholson's real estate throughout the commonwealth.   In December 1795 and March 1797, the state obtained judgments against him for large sums.   On these judgments a similar lien was asserted.   In 1806 and 1807, the legislature passed two acts authorizing commissioners under a warrant by the governor to sell the lands of John Nicholson in satisfaction of these liens.   At sales under this process, the defendants bought and entered into possession, and continued in possession more than twenty-one years without question, the youngest of the children of John Nicholson having been of age twelve years before the institution of the ejectment, and four of them having been of age at the time of the sales.

The plaintiffs contended,  1. That none of the accounts were so settled as to have become valid liens.  2. That the judgments were not a lien.  3. That the acts of 1806 and 1807 were unconstitutional and void.   The charge was on all the points to the contrary; and the opinion of the court was also adverse to the plaintiffs in overruling certain matters offered in evidence, and to be hereafter noticed.   The questions consequently are, whether there is error in the court's opinion either in charge to the jury, or in rejection of the offered testimony.

The acts of assembly of Pennsylvania which bear upon the subject, require to be more particularly stated.

At all times, before as well as since the revolution, Pennsylvania has had a special tribunal for the settlement of public accounts concerning her revenue and expenditures.   Prior to the act of the 13th of April 1782, this tribunal consisted of three auditors named by the assembly, whose certificate was conclusive in an action against the debtor.   Act of 1st March 1780, sect. 5, M'Kean's ed. of Laws, 287.   On the 13th of

April 1782, an act was passed to establish the comptroller-general's office, 2 State Laws, 44. In this office all public accounts were to be setiled, and then transmitted with the vouchers· to the supreme executive council. If approved by the council, and a balance was found due by the state, a warrant was to be drawn by the president of the council upon the state treasurer. If a balance was found due to the state, it was made the duty of the comptroller-general to take the most effectual steps to recover it, by filing a certificate of the debt in the office of the prothonotary or clerk of the county court, and taking a warrant against the body, and distress against the goods, and if there were none, then a fieri facias against the debtor's lands. The act makes no express provision for non-approval of· the settlement by the council. It gives neither appeal from the council, nor trial. by jury to the debtor, and it does not make the settlement a lien. By this act John Nicholson was appointed comptroller-general.

On the 18th February 1785, an act was passed, entitled " An act to give the benefit of'trial by jury to the public officers of this state, and to other persons who shall be proceeded against in a summary manner by the comptroller-general of this state." It allows an appeal by the debtor to the supreme court within one month after notice of a settlement approved by council, upon his giving security in the nature of special bail to prosecute the appeal; and as a necessary counterpoise to the right of appeal, the twelfth section enacts, " that the settlement of any public account by the comptroller, and confirmation thereof by the supreme executive council, whereby any balance or sum of money shall be found due from any person to the commonwealth, shall be deemed and adjudged to be a lien on all the real estate of such person throughout this state, in the same manner as if judgment had been given in favour of the commonwealth against such person for such debt in the supreme court." 2 State Laws, 247.

The law of Pennsylvania thus remained until the 28th March 1789, when an act was passed " for the appointment of a register-general, for the purpose of registering the accounts of this state." 2 State Laws, 704.

.This act was the commencement of an effort to introduce into the accounting department a check on the power of John

Nicholson, of whom the assembly became jealous, and whom they had not the power to displace. It directed the comptroller-general to submit all accounts before he settled the same to the register-general, and to take his advice in making such settlements; but the act was defective in several points, and especially in not requiring that the vouchers should be submitted with the accounts.

A supplement. was passed on the 30th September 1789, 2 State Laws, 751, to remedy this defect; and it ordered the comptroller-general to state, adjust, and strike the balance, and to report his opinion with the vouchers to the register-general, and to take his advice before final allowance.

This act was defective as well as the former, in making the office of the register-general merely advisory, without providing for a difference of opinion, or obliging the comptroller-general to follow the advice given, which it may be presumed, from what follows, that he showed no disposition to do.

The act of 1st April 1790, 2 State Laws, 787, was then passed, which, as to all subsequent accounts, directed the register-general in the first instance to examine, liquidate and adjust them, and afterwards to transmit them with the vouchers to the comptroller-general for his examination and approbation. If they agreed, the register was to transmit the account and vouchers as before to the council. As this act made the register-general the officer to settle public accounts, the fifth section enacted that " all such settlements of accounts shall have the like force and *effect*, and be subject to the like appeal at the instance of the party, as settlements heretofore made by the comptroller-general." ·

The law stood thus at the adoption of the present constitution of Pennsylvania on the 2d September 1790, when a single executive having been substituted for the council, successive acts of 14th January, 13th April, and 21st September 1791, 3 State Laws, 3, 73, 113, were passed, to give to the governor the power of performing all duties enjoined upon the council by former acts of assembly, and among others, that of revising and approving or disapproving the settlements of public accounts; but the last mentioned act provides, that all future accounts settled. by the comptroller and register, or either of them, shall be referred to the governor for his approbation, only

when they differ in opinion; and that in all cases where they agree, " only the balances due on each account shall be certified to the governor, who shall thereupon proceed in like manner as if the said accounts respectively had been referred to him according to the former laws upon the subject." By this act the governor was authorized " in like manner and upon the same conditions as heretofore," to allow appeals, or to cause suits to be instituted.

On the 4th April 1792, a further act was passed, entitled " An act to provide for the settlement of public accounts, and for other purposes therein mentioned." It was in the main a condensation of the existing system of accounts. It repeated several provisions then in force, added others not material, and repealed " so much of any former act as was thereby altered or supplied, and no more." The second section enacted, that when accounts were finally settled, either by the comptroller-general and register-general, or in case of their disagreement, by the governor, the comptroller and register were each to enter the same in suitable books, and upon such entry jointly to certify the balance, and the fund out of which it was payable, to the governor, who was to draw his warrant upon the treasurer for the amount.

John Nicholson continued comptroller-general under this system until the 11th April 1794, when he resigned his office.

But one act in regard to the settlement of accounts remains to be noticed. It was passed on the 20th April 1795, and is entitled " An act to provide for the settlement of the accounts of John Nicholson, late comptroller-general." 3 State Laws, 790. It authorizes the *comptroller-general* to employ clerks in adjusting John Nicholson's accounts, and as often as the accounts, or such parts of them as are independent of other parts, have received his approbation, it requires him to transmit them to the register-general, to be proceeded on as is directed in case of other accounts. It further requires the comptroller and register to make separate reports to the next session, of their progress in the settlement of these accounts.

In this state of the law, the three accounts which are in question were settled. The first was on the 3d and 8th March 1796, in which the comptroller-general preceded the register. This was during the next session of the legislature, after the

act of 20th April 1795.   The second was on the 20th and 22d December 1796, in which the register preceded the comptroller. The third was on the 20th December 1796, in which both officers signed on the same day.

I. The court charged the jury, " that these accounts between John Nicholson and the commonwealth or some of them, were so settled and adjusted, that the balances or sums of money thereby found due to the commonwealth, were good and valid *liens* on all the real estate of John Nicholson throughout the state of Pennsylvania."

This is a pure question of law, turning, 1, on the accounts produced by the plaintiffs themselves, and 2, on the acts of assembly already stated, and they will be examined in this order.

1. The accounts produced.

If any accounts settled by the register and comptroller-general have the *lien* attributed, it is supposed that these have it.   A few characteristics of them will be shown, and then the objections will be noticed.   It is sufficient for the judgment, if some one of them had a lien.   The court was not asked to say which of them, nor whether all had.   It was indeed immaterial if any one of them had it; but it will be contended to have been the effect of each one of them.

They were settled by the register and comptroller-general, with whom, by the acts of 4th April 1792, and 20th April 1795, this power was deposited; and they agreed.

They were settled in due official order.   If the act of 20th April 1795 is wholly inoperative, or if its operation continued beyond the session of 1795—1796, still there are two accounts which are settled by these officers in the proper order of precedence.   If the register must examine first, he has so signed the account of 20th and 22d December 1796, and the court in support of an official act, will intend that he first examined and signed that account which presents the same date to both signatures.   If the comptroller must examine first according to the act of 20th April 1795, he has so signed the account of 3d and 8th March, and it will be for the same reason intended that he signed and examined first the account of 20th December.

If the act of 20th April 1795 only suspended the usual order

of examination until the end of the next session, which is its
true construction, then all the accounts are settled in due order.
The order, however, is immaterial, as both officers are empow-
ered by law to perform the same acts, and both have performed
them.

They find a balance or sum of money due by John Nichol-
son to the commonwealth.   The question is not whether it is
regularly due, but whether the settlement *finds* it to be due, of
which there is no doubt.   The clear meaning of the accounts
on their face, is, that there is a balance found due by John
Nicholson to the commonwealth.   The account settled is the
" settlement of an account." Interpreted as all accounts should
be, expressing in the short language of accounts a well known
meaning, they find John Nicholson a debtor to the common-
wealth, in the sums necessary to balance the accounts.  No court
wants an interpreter to explain this.   It is the plain and uni-
versally understood language of accounts ; and what it means
is no more a matter of disputable fact, than what the Arabic
numerals in the columns mean.   The account thus settled, is
what the act means to describe as " the settlement of an ac-
count whereby a balance shall be found due."   No other terms
or finding can be necessary.   The finding is the settlement, and
the settlement is the account settled.   The balance of each ac-
count is a sum of *money* with which he is charged, because the
items of debit which exceed the credits, are sums of money, and
the account is a money account in the lawful currency of the
day of settlement, and not in the currency in which the certifi-
cates charged were themselves expressed.   One of the accounts
is doubtless in regard to continental certificates, but they are
estimated and charged at a certain price, in the then money or
currency of the country, according to the authority given to the
accounting officer, by the act of 13th April 1782, to charge the
value of public property and effects not accounted for.   *Conti-
nental certificates account,* is merely a denomination of the par-
ticular account, to show the origin of charge and discharge.
*Merchandise account, stock account, funded debt account,* are not
the less accounts in *money,* because they are so headed in the
ledger.   So of *account in continental certificates,* or *three per cent
stock account,* which is the language of these settlements.

Whether they are charged at too high a rate or otherwise, is no question here.

Finally, they are *public* accounts, and thus complete the description in the act of 1785.

The objections to this view are the following.

*The balances were not certified to the governor according to the act of 21st September* 1791. The answers are, First, that this was unnecessary when a balance was found due *to* the commonwealth. The object of the certificate was, that the governor might proceed in like manner as if the account had been referred to him according to *former laws.* The act of 13th April 1782, sect. 2, is the only act which regulated the proceeding, namely, that when a balance was due *by* the state, the executive was to draw a warrant on the treasurer, and when due *to* the state, that the comptroller should take steps for speedy recovery. The act of September 1791 did not mean that the comptroller and register should certify a balance to the, governor, upon which he was to do nothing. Secondly, if the certificate was ever necessary in such a case, it was not to give the lien. The certificate was first required by the act of September 1791. The lien is given by the act of 1785. The lien, if it attaches at all, does so immediately. There is no limitation of time to the certificate. If the omission to transmit it has any effect, it is merely to keep the appeal open, or to suspend the charge of interest. But there is no question here either as to appeal or interest. The lien is, and always has been, independent of both.

*The acts suppose but one settlement on which the lien is to arise, and here are several, and after all there were still accounts unsettled between the parties.* The answers are, First, that no act requires, or supposes all accounts to be settled at once, nor is it reasonable, unless they are dependent parts of the same account. The accounts in question purport, two out of three, to be independent accounts, and the third is but a continuation of one of the former, in consequence of a payment by the debtor, which changed the balance. Secondly, non constat, there were other accounts between the parties at that time. Thirdly, the act of 20th April 1795 authorizes a separation of the accounts into independent parts. Fourthly, the lien, if it exists, belongs to

the final settlement of an account, not to the settlement of a final account.

*The accounts were not entered in the books of the register and of the comptroller-general, according to the second section of the act of 4th April* 1792. The answers are, First, that if necessary by law, it must be presumed they were so entered, as it was the duty of the officers, and it does not appear but that they performed it. Secondly, the accounts on their face, show that they were entered at the date of the settlement. The memorandum on the account of 20th December 1796, that it was not entered until June 1800, was shown by the evidence to be an interpolation by a stranger. Thirdly, the entry in the books is no part of the settlement, nor connected with it. The design of it was exclusively fiscal, to show the resources of the commonwealth, and her liabilities, by an index of her debts and credits.

*No notice of the intended settlement was given to the debtor.* The answers are, First, that notice was not necessary by the act. It was made the duty of the debtor to submit his own account for settlement, and it is to be presumed that he did. Secondly, if necessary, the presumption of law after such a length of time, and nothing appearing to the contrary, is, that the officers did their duty. This presumption is made on the principle of quieting possession, of sustaining official acts, and of supposing that things which it would have been culpable to omit, were rightly done. Hillary v. Waller, 12 Ves. 252, 226; Eldridge v. Knott, Cowp. 215; Pickering v. Stamford, 2 Ves. Jun. 583; King v. Long Buckley, 7 East, 45; Society v. Young, 2 N. Hamp. Rep. 310; Brown v. Wood, 17 Mass. 72; Hartwell v. Root, 19 Johns. 345; Williams v. East India Company, 3 East, 192; Monke v. Butler, 1 Roll. Rep. 83; King v. Hawkins, 10 East, 216; King v. Verelst, 3 Campb. 432; Taylor v. Cook, 8 Price, 653; Wilkinson v. Leland, 2 Peters, 660; Ex parte Bollman, 4 Cranch, 129; Willink v. Miles, 1 Peters's C. C. Rep. 429; United States v. Batchelder, 2 Gall. 16; Fales v. Whitney, 7 Pick. 225; Starkie on Ev. 4th part, 1250. Thirdly, the public act of 20th April 1795, was notice. And lastly, the accounts produced on the plaintiff's subpœna to Harrisburg, were proof of actual notice. They bear date before the two settlements in December 1796, and were preparatory to them. Possession

of these by John Nicholson and his counsel, which was in undisputed proof, was such evidence of notice, that being uncontradicted, the court was entitled to say to the jury, that they ought to suppose notice. It is not admitted that the judge was asked to leave notice to the jury as a matter of fact.

*The settlements were merged in the judgment of March 1797. Transit in rem judicatam.* The answers are, First, it is not shown that the judgment was for the same debt as the settlement, nor was the court asked to instruct the jury upon that hypothesis. This court will not infer a fact from the mere similarity of items, to involve the circuit court in error. Secondly, the doctrine of extinguishment, as drawn from the principle *transit in rem judicatam,* applies only to the very cause of action in suit, and does not affect collateral securities or collateral concurrent remedies. The cause of action in that suit was not the settlement, nor the settled account, but the trover and conversion of certain certificates of stock. The settlement remains as it was, with all its incidents and securities. Had the cause of action been the debt due, it would not have altered the case. The settlement remained, and if a lien attended it, the lien also remained. A judgment without satisfaction is not an extinguishment of a collateral remedy for the same cause of action. Chipman v. Martin, 13 Johns. 240; Bantleon v. Smith, 2 Binn. 146; Day v. Seal, 14 Johns. 404; Gordon v. Corry, 5 Binn. 552; Houldebil v. Desanges, 2 Stark. N. P. C. 337; Lenox v. M'Call, 9 Serg. and Rawle, 302; Drake v. Mitchell, 3 East, 258.

*The settlements were waived by bringing tort for the stock, and the contract of the accounts cannot now be set up.* The answers are that the identity of the demands is not established by evidence; that if it were, it was the duty of the debtor to avail himself of the objection by pleading the settlements. Not having done so, he is in the case of a defendant who suffers judgment both in tort and contract for the same thing. All he can object to is double satisfaction, and that question does not arise. The judgment in trover is not a waiver of the settlement, because it is entirely consistent with it, both proceeding upon the ground of converting or not accounting for the public money. The conflict between tort and assumpsit springs from forms of action, and is entirely technical.

[Lessee of Livingston v. Moore and others.]

2. These accounts then having been duly settled, and followed by a lien as much as any accounts could be, the question arises whether any accounts settled in 1796, agreeably to the acts of assembly then in force, were attended by a lien.

A lien was at one period given to a settlement in the accounting department beyond doubt. It has never been expressly repealed, nor has the law been expressly supplied or altered in this respect, so as to bring the twelfth section of the act of 1785, within the repealing clause in the eleventh section of the act of 1792. The question then is, whether the system of accounting has been so changed, as that the security intend-

and given by the act of 1785, has become impracticable and is lost. The objections to such a view of the law are not easily obviated. The *lien* was given as a counterpoise to the right of appeal. The act of 1785 is an act giving and regulating appeals and the lien. There is no other subject introduced into it. Now the whole of the act, so far as it regards appeals, must be admitted to have continued in force, until after these settlements. An appeal continued to be the express right of the debtor under every subsequent modification of the law, and yet the act of 1785 was the only act to regulate the subject, until the act of the 20th of March 1811, Purdon, 764. The continuance of this part of the system is a powerful argument in favour of continuing the lien to the commonwealth, which alone reconciled the appeal with the public interest. The security of special bail was inadequate. The present accounting system of Pennsylvania, under the act of 1811, continues to connect appeal and lien together.

The *lien* given by the act of 1785, belongs moreover to a settlement in 1796 by necessary implication, and also by express enactment.

First, by implication. In 1782, the department of accounts consisted of the comptroller, with a power of revision in the executive. The comptroller alone settled. The executive did not settle. The comptroller pronounced the judgment; the council approved or disapproved, and in the former case left the settlement in force as the judgment of the comptroller. This is the clear language of the act. The act of 1785 speaks in the same terms. The appeal is from the comptroller's settlement, from his award, and not from the council's confirmation. The act of March 1789 is to the same effect. Before

the comptroller shall *finally settle* an account, in pursuance of former laws, he is to transmit it to the register. The comptroller then was deemed to settle the account finally. The acts of 30th of September 1789, and 1st of April 1790, repeat the provision. Further, when we recur to the twelfth section of the act of 1785, we perceive that the lien is given to the *settlement* by the comptroller confirmed by the council, but not to the confirmation of the council. It is given to the comptroller's settlement perfected according to law. The virtue of the proceeding is in his settlement sanctioned by the council, but not in the sanction of the council. In case of appeal it is his settlement that is established by the court, and not the sentence of confirmation by the council. The lien is given to that adjudication which finds the balance to be due, namely, the settlement by the comptroller, and not to the confirmation by council, which does not find any thing due, but only establishes the settlement. If we find then, as we do, that the sanction of the governor under the constitution of 1790, is substituted for that of the council under the constitution of 1776, and afterwards that in a certain event which exists in this case, to wit, the approbation of another officer, the executive sanction is superseded, it follows by necessary implication, that the settlement, either with the substituted sanction, or with no sanction at all, is perfected to the same extent that was required by the act of 1785 to produce the lien. It is to be recollected that the act of the 1st of April 1790, which makes the register-general the settling officer, declares that all settlements by him shall have the like force and effect as settlements before that time made by the comptroller. If therefore, a settlement by the comptroller after the change in the constitution, and the substitution of another sanction for that of the governor, would have given the lien, a settlement by the register approved by the comptroller, must do the same.

Secondly, by express enactment. The eleventh section of the act of 4th of April 1792, by repealing no part of any former act except such as is by that act altered or supplied, transfers all the efficacy of the acts of 1782, 1785, 1789, 1790 and 1791, to settlements under the act of 1792, which these were. The act does not alter or supply the provisions in regard either to appeal or lien. It alters certain accidents of the settlement.

its form and the order of its parts, and supplies new provisions for them; but it expressly retains all those acts and parts of acts which give force, effect and substance to it.

These views are sustained by the general rules of interpretation, applied to several statutes in pari materia, and particularly to affirmative statutes, made for the public security. They should be so construed as to retain the benefit of that security, which was essential to the public, to which there is nothing repugnant in any part of the old system, and which has been expressly continued in the new.   These statutes are to be taken into the construction of one another, and to be interpreted as if they were different sections of the same statute. Earl of Aylesbury v. Patterson, Doug. 30 ; Wallis v. Hodson, Barnard. Chan. Rep. 276 ; Anon. Lofft, 398 ; Foster's case, 11 Rep. 63 ; Chapman v. Pickersgill, 2 Wils. 146 ; New River v. Graves, 2 Vern. 431 ; Eyston v. Studd, Plowd. 467 ; Yale v. King, 19 Vin. Ab. 517; Statutes, E. 6, 58; Plummer v. Whichcot, Tho. Jones, 63 ; Thornby v. Fleetwood, 10 Mod. 118 ; Johnes v. Johnes, 3 Dow. 15 ; Alcheson v. Everit, Cowp. 391.

The suggestion that this lien was taken away by the intestate law of the 19th of April 1794, which among creditors in equal degree postpones the commonwealth to the last, is wholly without foundation.   That act does not disturb any lien, except in the case of a sale by order of the orphan's court, and then the court gives the lien creditor his priority by distribution of the proceeds.   Moliere v. Noe, 4 Dall. 450 ; Girard v. M'Dermot, 5 Serg. and Rawle, 128.

This court will however, regard the charge of the circuit court on the first point, as to the lien of these accounts or some of them, as sustained authoritatively by the decision of the supreme court of Pennsylvania.   The case of Smith v. Nicholson, 4 Yeates, 6, in the year 1803, judicially affirmed the lien of these accounts, that case having presented precisely the same issue of law upon the same facts ; and as it is a decision of the highest judicial tribunal of Pennsylvania, upon the interpretation of a statute of that state, this court will receive it as an authoritative exposition of the state law. The same interpretation was recognised and adopted by the same court, in the United States v. Nichols, 4 Yeates, 25, and it has been universally acquiesced in with the exception of this

suit, for thirty years.' The state has legislated upon that basis. Purchasers have bought and parted with their money in faith of it. The judgment creditors of John Nicholson, have one and all from that time yielded their priority to the commonwealth; and it is only by this acquiescence, and the consequent omission to pursue their executions, that an acre of land in Pennsylvania, has been left to his heirs, to raise the present question. To examine the arguments of either the counsel or the court in the printed report of that case, and to weigh or sift the reasons to ascertain whether they are unanswerable, or the best that could have been given, would be both invidious and at variance with the law of this court, which adopts the state decision in such cases, not because it is abstractly right, but because it is the unreversed decision of the highest state court. Shipp v. Miller's heirs, 2 Wheaton, 325; Jackson v. Chew, 12 Wheaton, 168; Green v. Neal, 6 Peters, 291. "A fixed and received construction of a statute by a state in its own courts, makes a part of the statute law."

II. The charge that the judgments were liens throughout the state of Pennsylvania, was in accordance with the settled law of its courts. White v. Hamilton, 1 Yeates, 183; Ralston v. Bell, 2 Dall. 158; Act of 5th March 1790, 2 State Laws, 771, sec. 2; Act of 18th February 1785, 2 State Laws, 221, sec. 12. The law so remained until the act of 20th March 1799, sec. 14, 3 Smith's Laws, 358. The objections made in this court, that the defendants cannot have the benefit of these judgments in the deduction of title, because they are not referred to in the acts of 1806 and 1807, and because the liens were lost for want of a scire facias within five years, according to the act of April 1798, and further, because the largest judgment is interlocutory, are untenable. The acts of 1806 and 1807 speak of liens generally, embracing all liens for the debts of John Nicholson. The act of 1798 does not require a scire facias in such a case. Executions had been issued. Young v. Taylor, 2 Binney, 218; Pennock v. Hart, 8 Serg. and Rawle, 376. The object of the act was to protect purchasers, and, at most, other creditors. As to the judgment debtor and his heirs, the lien is perpetual. The judgment of 1797 was in its terms final and conclusive, unless errors should be shown within the time limited; and no such errors were ever shown.

III. The third point of the charge involves the validity of the acts of 1806 and 1807.

An allegation that the statutes of Pennsylvania were, at the date of these acts, or at any time, designed to prostrate the constitution and the law, cannot receive the countenance of this court. The fidelity both of her legislature and courts, to the constitution and the law, their intelligence in comprehending them, and their deference to the constitutional umpirage of this court, are, and uniformly have been, equal to those of any other state in the union. In regard to the estates of John Nicholson, the act of 4th April 1805, 7 State Laws, 272, which authorizes the sale of the state lien and debts to members of his own family, with a credit of ten years for payment of the amount, and which failed from the entire incompetency of those estates to furnish the security, is an evidence of unsurpassed tenderness to a public debtor, and irrefutable proof that the acts in question were not passed with that purpose of aggression upon either public law or private rights, which it has been the plaintiff's effort to establish as their motive.

The consideration of the acts of 1806 and 1807 must be imperfect, unless it is connected with the state of circumstances at their enactment. The demands of the state had been established according to law, namely, by final settlement in the department of accounts, and by confession of the party, in the highest court of original jurisdiction in the state, with the fullest opportunity of trial by jury in both cases. The debtor was dead, and his heirs had removed to Louisiana. He had died in prison, and his estate was so desperately insolvent, that no administration was asked to it until after the institution of this suit. His means, and the public money by his misapplication of it, had been dissipated in land speculations through fifty counties, in every stage of title, from warrant and survey returned, to surveys unreturned and warrants unsurveyed. The whole was liable to be swept away by sales for taxes, before successive executions, according to the course of the courts, could have gone through a tenth of the counties. The title was moreover so involved, that a sale by the sheriff in the ordinary way would not have raised the costs. Individuals and associations also, by such devices as shipwreck commonly brings into action, endeavoured to conceal for their own use, a portion of the pro-

[Lessee of Livingston v. Moore and others.]

perty that had been cast upon the strand, without regard to the legal claims of any one. The only hope of salvage consequently rested upon just such an interference as was authorized by these acts.  Whether it was constitutional is the question.

The characteristics of both the acts, are essentially the same. They are, First, to raise the money without sale, by compromise and transfer of the state lien. Secondly, to prepare the way for beneficial sale by investigating title, demanding, and by due course of law recovering, John Nicholson's papers from those who had no right to them, making partition in case of joint interest, and by staying sales for taxes. Thirdly, to sell under a warrant or writ by the governor, in the most beneficial way, upon credit, so much of the land as would raise the proportion of the lien debt averaged upon the particular tract sold, after a longer public notice of sale than the general execution law required, and in certain cases where the tract would not raise its proportion of the debt, to authorize a purchase by the commissioners for the commonwealth. The proceedings of the commissioners were to be under the sanction of an oath, and they received their compensation from the state, and not from the property of the debtor.  In a word, the acts create a special authority to sell in satisfaction of liens for state debts, duly established according to law, with the fullest opportunity of trial by jury upon appeal from the settlement, and in regard to the judgment, with a jury sworn at the bar to try the issue, when the defendant confessed the damages.  His estate was liable by the general law to make this satisfaction.  The acts leave him and his representatives the unimpaired right to contest the liens in any and every way in the courts of justice; and they have done it in this case without stint, and without receiving any answer except upon the merits of their allegations. If there was no lien, the defendants have no title.  If the debt was paid or released, the purchaser is not protected by these acts, as a purchaser at sheriff's sale would be under an execution upon a satisfied judgment.  The debtor's remedy for any wrong done to him in the execution of the acts, is larger than if the sale had been made under the process of a court.  It continues open for an unlimited time, may be set up collaterally in the investigation of any title con-

veyed under it, and has the benefit of a strict construction of the special authority conferred by the acts.

The question gravely is, whether the legislative power of Pennsylvania is competent to the creation of such an authority, or whether it is restrained by what is termed organic law from creating a power of sale, to be exercised by any thing but a court of justice.

Such a position as the last denies to the legislature of Pennsylvania the least and humblest of legislative capacities. The practice of all the states under their respective constitutions is against the proposition. The whole subject of remedial process, and of remedial laws of every kind, is entirely within the competency of the legislature. The forms of writs, original and final, are varied at pleasure. Powers of sale to assist or enforce vested rights, are created by them every day, and in every way and manner that convenience requires, in commissioners to sell for taxes, in executors and administrators to sell for debts, in guardians, committees of lunatics, and trustees generally. The very power in question, to sell in satisfaction of a lien annexed to the settlement of a public account, is given by an act of congress, under no larger a charter than is possessed by the state of Pennsylvania. Act of 15th May 1820, sec. 2, 3 Story's United States Laws, 1791. The adjudications are numerous, that when it is not an existing power in the courts, the legislature may create it; and that when it is, they may delegate it to another body: that as all legislative powers appertain to sovereignty, the choice of means to enforce existing rights belongs, in the absence of express restraint by the constitution, entirely to the legislature, to select any they may deem appropriate. Stoddart v. Smith, 5 Binn. 355; Wilkinson v. Leland, 2 Peters, 627; Estep v. Hutchinson, 14 Serg. and Rawle, 435; Rice v. Parker, 16 Mass. 330; M'Cullough v. The State of Maryland, 4 Wheat. 316; Fisher v. Blight, 2 Cranch, 396.

The matter of inquiry is, whether there is a constitutional restraint, and where it is.

By the constitution of Pennsylvania, article 1, section 1, the whole legislative power of the commonwealth is vested in the general assembly. In the creation of tribunals for the exercise

[Lessee of Livingston v. Moore and others.]

even of judicial powers, the legislature are under no restraint. They may place it where they please, and in themselves if they see fit. "The judicial power of this commonwealth shall be vested in a supreme court, &c. &c., and in such other courts as the legislature may from time to time establish." Art, 5, sec. 1. The power of the legislature to grant chancery powers to existing courts, or to create chancery courts, is without limitation. Besides the equity powers granted by the constitution to the supreme court and courts of common pleas, to perpetuate testimony, &c., "the legislature shall vest in the said courts such other powers to grant relief in equity as shall be found necessary, and may, from time to time, enlarge or demand those powers, or vest them in such other courts as they shall judge proper, for the due administration of justice." Art. 5, sec. 6. The legislature, consequently, are not bound, in the erection of tribunals of any description, to prescribe to them the course of the common law, or the course of law as distinguished from equity ; nor are they bound to vest powers either ministerial or judicial in existing tribunals. The whole subject is open to the legislative body to do as it seems fit. What then may be extracted from the plaintiffs' argument as objections to the acts of 1806, 1807 ?

1. It is said to be the exercise of a judicial power by an extra-judicial tribunal. The answer is already given, that this, if true in fact, would not be an objection. If it be a judicial power, the tribunal to which it is granted is within the range of the legislative powers of the commonwealth, vested in the general assembly. If it is not a judicial power, the objection fails in fact. It is indeed not judicial, but ministerial and simply remedial of an existing right. The power to compromise and transfer the state lien, if the former be judicial in its character, was not exercised in the present case, and never can be objected to by the heirs of Nicholson, because they cannot be affected by its exercise. It concerns the commonwealth and the transferee only. Whether judicial or not, and whether the constitution of Pennsylvania be unusually large in the grant of legislative powers or not, the objection has no weight. Cooper v. Telfair, 4 Dall. 14 ; Wilkinson v. Leland. 2 Peters, 660 ; Jackson v. Griswold, 5 Johns. 142 ;

[Lessee of Livingston v. Moore and others.]

Rice v. Parker, 16 Mass. 330; Satterlee v. Mathewson, 2 Peters, 413.

2. It is said to be ex post facto by its retrospective effect. It is not ex post facto. Laws of that character have relation to crimes. Calder v. Bull, 3 Dall. 386, 396; Fletcher v. Peck, 6 Cran. 138; Commonw. v. Lewis, 6 Binn. 271. If retrospective, that is not sufficient, there must be something more. There is no clause in the constitution of the state of Pennsylvania or the United States, against retrospective laws. Such a clause would have struck the legislative power as with a palsy. As to remedies, all defects in existing cases would have been made incurable by it; and even as to rights, circumstantial defects might have been extensively fatal. Retrospective laws, enforcing vested rights, are among the most indispensable and beneficial acts of legislation. *Ubi leges cum justitia retrospicere possent,* the courts cannot avoid enforcing them. They have been repeatedly sanctioned, and their constitutional validity asserted. Calder v. Bull, 3 Dall. 386; Bomback v. Bomback, 11 Ser. and Raw. 191; Holder v. James, 11 Mass. 396; Foster v. Essex Bank, 16 Mass. 270; Mason v. Hale, 12 Wheat. 375; Tate v. Stoolfoots, 16 Ser. and Raw. 35; Underwood v. Lilly, 10 Ser. and Raw. 101; Satterlee v. Mathewson, 2 Peters, 413; Goshen v. Stonington, 4 Connect. Rep. 221; Mason v. Hale, 12 Wheat. 378; Sturgis v. Crowninshield, 4 Wheat. 200; Bank of Columbia v. Okely, 4 Wheat. 205; Young v. Bank of Alexandria, 4 Cran. 397; Wilkinson v. Leland, 2 Peters, 658. The retroaction of these acts, if any, was to authorize a special process of sale, which justice and the general law warranted, and to which the power of a general court of chancery would have been competent, without any act of the legislature. If the exercise of the authority devests any rights, it does so in favor of vested rights. A court of equity could have done the same thing. The objection then is that the powers of a court of equity, which the legislature may create or grant to the utmost extent, and to any tribunal whatever, they cannot grant in a partial degree to commissioners, nor exercise it themselves.

3. It is said to be a violation of the trial by jury. The

acts deny nothing, but the inquisition upon the writ of fieri facias which compels a plaintiff to take an extent, if the rents and profits are found sufficient to pay in seven years. In regard to wild lands, however, like the tracts in question, they do not deny it, any more than the act of 1705. An inquisition is not necessary in such a case. 2 Dall. 77; 1 Yeates, 427; 2 Binn. 91; 2 Yeates, 150, 454.

At the same time the power of the legislature over such inquests, as part of the process, or to assist the court in the assessment of damages, is perfect and complete. They may restrict it, or abolish it altogether. It forms no part of the trial by jury secured by the constitution, and can be repealed at pleasure.

"Trial by jury shall remain as heretofore." The constitution does not say that in all cases in which facts have been heretofore ascertained by a jury or inquest, they shall continue to be so, but that *trial* by jury shall remain. What is *trial* by jury? This language is taken from the English common law, known and used in the colonies before the revolution. It is not a loose and vague expression, but of definite signification. It was not intended to bind the legislature to the old modes of ascertaining collateral facts, or for the determination of matters concerning which there is no judicial controversy, but to secure a great and well known mode of trial for the determination of *an issue*. *Trial* is the examination of the matter in issue. It supposes a suit, criminal or civil, an issue formed, and the reference of this issue for decision to some tribunal. It is the probation of the matter in issue, before judgment, and upon which judgment is to depend. Trial by jury, therefore, as one of the modes of trial known to the common law, is the probation of a matter of fact in issue between parties in a depending suit before judgment; it is its probation before that body, sometimes twelve in number, and in some actions more, to whom, according to the course of the law, the decision of issues in fact belonged before the constitution, in proceedings according to the course of the common law. This is the *trial by jury*, the right to which is secured, and its great value is in the decision of issues in criminal causes. The clause has no reference to such a case as the present. The right of trial by jury, in its constitutional sense, Nicholson had, and did not choose to exercise or enjoy it.

4. It is said to impair the obligation of a contract by the state with John Nicholson, and several contracts have been imagined. First, the contract is supposed to be implied in the words of the act of 1785, that the settlement shall be a lien " in the same manner as if judgment had been given in favour of the commonwealth," namely, to be enforced in the same manner by process of execution from a court. The meaning of this clause of the act of 1785 may be, either that the lien shall be equally *extensive* over the state, or equally *conclusive* of the debt in favour of purchasers, or of the same character and *effect* as that of a judgment; but it cannot be what the plaintiff supposes, because the thing concerning which the identity is enacted is the *lien*, and not the mode of enforcing it. The nature of the lien of a judgment as a general and not a specific lien, was well known in Pennsylvania, and the object of the clause was to liken the lien of a settlement to that which was already known. The clause had no other object. Secondly, a contract is supposed to be implied by the confession of judgment, that it shall be enforced only by execution. There is no warrant for any such implication. The contract of a judgment, or the obligation of the contract, is by the debtor to pay it; there is no contract or obligation in the creditor to obtain payment only in one way. He may obtain it through execution, or scire facias, or debt, or foreign attachment, or, by bill in equity, or in any other way that the law allows at its date, or may subsequently allow. This suggestion, that the process to enforce a judgment is obligatory upon the creditor, in manner and form as it exists at the entry of the judgment, mistakes the creditor's rights for duties, and the duties of the debtor for rights. Thirdly, a contract is supposed to be implied in the grant of the land by the state to Nicholson, that the state would not resume the grant, nor sell the land by any extra-judicial, public, or arbitrary means. The state has not resumed the grant. The title of Nicholson is now the title of the defendant, not passing through the state, but transferred directly in satisfaction of debt by the process of the law. The nature of that process, whether it should be the old or a new form, and whether enforced under the supervision of a court or of commissioners, is within the competency of the legislature to decide. Unless every grant of land by the commonwealth

is a contract for the perpetual continuance of all laws existing at its date, and for the introduction of no other, there is no weight in this objection. Contracts by the commonwealth, not to use the constitutional power belonging to it, are not to be implied in the rash and fanciful manner of these exceptions. They require the support of clear and plain expressions. Providence Bank v. Billings, 4 Peters, 563 ; Jackson v. Lamphire, 3 Peters, 289.

It is said that the acts of 1806 and 1807 are partial laws made by the state for its own benefit, by which it has decided the question of right in its own favour. This is a misapprehension. Every question of right was previously settled by an impartial tribunal. Nothing remained but the remedy. If the state cannot devise a new remedy for its own rights, neither can it for those of a private person. If the acts are bad because the state is a party, the public interests must remain without protection, since the state must always be, to the same extent as now, a party to the legislation that protects them. As to partial legislation generally, there can be no reason for making a remedy larger than the mischief, and the legislatu e are the exclusive judges of the extent of any mischief that requires legislative aid. Whether an act should comprehend one case or a thousand, depends solely on the pleasure of those, from whom alone the act is to proceed.

Finally, it is supposed that these acts violate those clauses of the Pennsylvania bill of rights which prohibit unreasonable seizures, and the taking of property without the judgment of peers, or the law of the land. The answer to these is that there is nothing seized or disposed of, but what the general immemorial law of the state has devoted to the payment of debts. The multiplicity of constitutional objections by which the plaintiffs' argument has been distinguished, is probably owing to the difficulty of finding any one that possesses strength enough to stand by itself.

The points of evidence may be briefly disposed of. The journals of the house exhibiting the paper No. 21, being a statement of debts due the commonwealth on the 1st January 1797; the report of the committee of ways and means of 24th March 1798; and the report of the same committee of 30th March 1799; being offered to prove that the accounts of the commonwealth

and John Nicholson were not then finally settled, were properly rejected, because, 1. They were none of them competent evidence of the fact. If the question be what the house has done, and if that fact be relevant, the journals are evidence, but not as to facts stated in any report, order or resolution. 1 Phil. on Ev. 305, 323; Kelly v. Jackson, 6 Peters, 630; Titus Oates's case, 4 State Trials, 30. The only exception is when the fact to be proved is an act of state, as the king's speech and answer. King v. Holt, 5 D. and E. 445. 2. Because the fact was not relevant. Suppose all the accounts not then finally settled, or suppose the judgment and settlements to have been for the same cause, the title of the defendant was still good because the debt and the lien remained, until satisfaction. Leger C. was not evidence of itself, because it was not a book of original entries; it was a mere index, and an imperfect one too. Had it been an original book, it was offered too late, namely after the defendants' evidence was closed. It was not introduced to rebut any thing, and when that is not the case, the admission of additional evidence by the plaintiff after the defendant has finished, is in the court's discretion. The refusal is not matter of exception. Conard v. Atlantic Ins. Co. 1 Peters, 451; Salmon v. Rance, 3 Ser. and Raw. 314; Frederick v. Gray, 10 Ser. and Raw. 182 ; Irish v. Smith, 8 Ser. and Raw. 573.

Mr Sergeant, on the same side, (also for the commonwealth of Pennsylvania) argued as follows :

The title of the defendants is this. They claim under a public sale, fairly made, on the 15th July 1807. The money was paid (eighty-six dollars and sixty-seven cents for four hundred and thirty-eight acres and sixty-two perches), and a deed duly made under authority of law the 18th March 1808. The sale and the deed were of lands within the commonwealth of Pennsylvania. They were made under two laws duly passed by the representatives of the freemen of Pennsylvania. The one of these laws is dated the 31st of March 1806, the other, the 19th of March 1807. The title of the first of these acts is "an act for the more speedy and effectual collection of certain debts due to this commonwealth." The second, is a supplement. Under this purchase, the title is regularly derived to the de-

fendants. They, and those under whom they claim, have been in possession, actual or constructive, ever since, that is for twenty-one years before suit, *without question.*

The title of the plaintiffs is as follows. They claim to be the heirs of John Nicholson, and nothing else. They stand in the place of John Nicholson, with his right, whatever it is, and no more. They are neither creditors nor purchasers, nor have they any equity to add to the title that was in him. It is now to be seen what this title is, which they rely upon to overturn the laws, possession, deed and all. They have a warrant of the 24th of March 1794, for four hundred acres. It was one of five hundred and thirteen warrants taken out by Mr Nicholson for two hundred and three thousand five hundred and sixty acres, at fifty shillings a hundred. On the 14th of June 1794, he paid into bank fourteen thousand two hundred and fifty-four dollars for the whole quantity, this tract included. With whose money it was that he paid, does not positively appear. But it is fully proved that at the very time, he owed to the commonwealth more than one hundred thousand dollars for money and securities abstracted from the funds committed to him as comptroller, in violation of his official trust. There can be no great merit in paying the commonwealth with her own money, or in making official misfeasance contribute to private aggrandisement. A survey was made in August 1794, and duly returned. No deed poll is produced from the warrantee. It is useless, however, to scrutinize the title in its inception. By agreement between the plaintiffs and defendants (to which the commonwealth was no party) this is admitted. The title of John Nicholson, then, is warrant and survey in 1794, and payment of exactly twenty-four dollars and sixty-seven cents.

This is the whole of the title. From 1794 to 1828, a period of thirty-four years, the history is a blank. No possession was taken. It is not pretended. No claim of ownership. It is out of the question. No contribution to the prosperity of the commonwealth. Not even a tax paid. In the mean time, what happens? By the common exertion and contribution of the state and her citizens, the public prosperity is promoted. *These lands* are cultivated, improved and settled, at a great expense of money and labour, giving them a value they had not before. Then, after thirty and more years, come the heirs to

take the lands and improvements. There is a time for all things. Being suffered to pass, there ought to be an end of claim.

Of all that has been done, and all that was doing, the heirs had notice. Whatever has been done, has been done by or under public laws. A public law is notice to every body.

But, it is said, they were in another state, and were under the disability of infancy. As to the first, the answer is very obvious. Their being in another state, makes no difference where the question is of lands in Pennsylvania. They are affected, wherever they may be, with notice of the legislation of Pennsylvania upon lands within her limits.

Infancy makes no difference, where it is a question about charges upon land. This is an ancient common law principle. 1 Inst. 380, b; 2 Inst. 703. An infant's land may be sold under mortgage. It may be sold to pay debts. It may be sold to pay taxes. He is bound to take notice of public laws, unless expressly saved. In equity, he is bound where he stands by and does not give notice of his rights. 9 Mod. 38; 2 Eq. Ab. 489; 1 Brown's Rep. 353. A case like this, would be a fraud upon every principle of equity.

But the allegation of infancy is not founded in fact. The record shows that the oldest of the children of John Nicholson was of age twenty-four years before the suit was brought, and the youngest living, fifteen years.

Claiming, as they do, in right of their ancestor, it is but fit to say, that their ancestor had no property. He died insolvent; and he died in jail. That could not have happened in Pennsylvania, unless there were strong imputation of misconduct. So desperate were his affairs, that no administration was taken out. He was overwhelmed with judgments, as the record will show, for which no satisfaction could be had, and which, as well as his other debts, still remain unsatisfied. All that ever was in his name would not now pay his debts. But these debts are in various ways affected by length of time. Some are barred by the statute of limitations. In many, the securities are lost, the parties dead, or other changes have happened to destroy their activity, and to open a chance of getting the property without paying the debts. What a revolution it

would be ! We have heard of posthumous fame. This is a new mode of creating a *posthumous fortune.*

Suppose, for a moment, it were John Nicholson himself. Could he be listened to for a moment? The suggestion is too extravagant to be entertained. What property could his heirs derive from him? Looking at his history, as spread upon the record, it is not too much to say it is impossible he should have had any. It is an abuse of terms, in defiance of such evidence, to talk of property derived from him. Such suits seem to be speculations upon human memory and the preservation of papers and records. They must be founded upon the calculation, that after a length of time, many things will be forgotten or lost, and what is known to be true, cannot be proved. The boldness of the undertaking is without a parallel in judicial history. The plaintiffs attempt to overturn (as will be seen in the sequel) eight acts of the legislature of Pennsylvania ; three settlements of public accounts, made almost forty years ago ; two solemn decisions of the supreme court of Pennsylvania ; a judgment of the same court, and a deed made by the commonwealth of Pennsylvania. All this, too, by a new light, arising after twenty-five years of darkness, and against bona fide purchasers without notice. This court is called upon to exert a power of destroying, far transcending all former precedent. Single laws, and single acts, have been questioned. But this suit proposes a sort of general nullification of all that has been done for a third of a century.

What is more particularly to be said, in answer to the claim set up by the plaintiff in error may be presented under these heads, which will comprehend all the errors assigned in the charge.

I. That the commonwealth of Pennsylvania had liens upon the lands of John Nicholson, for a debt or debts owing to her.

II. That the acts of 1806 and 1807 were constitutional acts; and the proceedings under them, valid and effectual to enforce those liens, and recover the debts.

1 The commonwealth had three liens.

1. By the settlements of March and December 1796

2. By the judgments in the supreme court.

3. By the fact that a debt was due to her from a person deceased, that is, John Nicholson ; in other words, she acquired a lien by his death, if she had none before.

It is immaterial what was the nature of the lien, provided there was a lien. The essence is, that a debt was due. Against those claiming as heirs, *that*, of itself, was sufficient.

1. The commonwealth of Pennsylvania had a lien by the settlements of March and December 1796.

Before examining the acts, I will lay down some general principles, unquestionable in themselves, and applicable to the present case.

1. That in the management of her own fiscal concerns, Pennsylvania has the power of a sovereign and independent state.

2. That she has a right to make laws for the collection of her revenue, and for the settlement of accounts of public debtors and creditors. It is necessary for creditors, as well as for debtors, because the state is not suable, and they can only obtain payment by means of such laws.

3. That she has a right, for this purpose, to constitute such tribunals, and establish such modes of proceeding as she may think proper. That peculiar laws and peculiar proceedings are indispensable, and universally adopted, because the administration of the revenue of a state cannot be adequately managed, nor with the necessary dispatch, by the agency of the ordinary tribunals or the ordinary forms. And that this is not at all in derogation of the common law, which cannot properly be said to apply to it. It is done by the United States, and by every state in the union.

4. That she has a right from time to time to alter these laws and proceedings, according to her own view of her own exigences, as fully as the United States or any other state.

5. That persons accountable to the commonwealth, have no vested right in the particular provisions of accounting laws, which can interfere with this power of the state. The act of congress of the 15th of May 1820, is retrospective, as well as prospective, in its operation. The question mooted in 4 Wheat. 4, as to the right of reducing salary, has no bearing upon the present.

6. That the acts and proceedings of these special tribunals

[Lessee of Livingston v. Moore and others.]

need not be according to the course of the common law, but must be according to the exigences of the state. Such has been the practice from the earliest period of the commonwealth, allowing finally, on appeal or otherwise, a trial by jury, since 1785.

7. That the proceedings of such tribunals, however constituted, are entitled to respect; they are not to be collaterally questioned; and after a length of time, every thing is to be presumed in their favour, as in favour of any other tribunal. Thompson v. Toulmin, 2 Peters, 157.

8. That where acts are done by accounting officers, according to law, they will produce their legal effect, without any regard to the intentions of the officers themselves.

9. That where the power of the commonwealth over this subject is exercised in part, the residue is not parted with or destroyed, but reserved in full force, to be executed in such mode as the legislature may think fit. In other words, the subsisting laws are not a contract with the office or accountant, but are liable to be altered at the will of the legislature. Providence Bank v. Billings, 4 Peters, 514, 559, 560, &c.

This was the understanding and practice of the state before the constitution; it has been so since; it is so with the United States, and every state in the union. In relation to public dues, it must be so.

With the benefit of these principles, then, let us proceed to the first inquiry, which may be examined under two heads.

1st. Were the settlements of March and December 1796, settlements according to law?

2d. If they were, did they constitute a lien?

1. They profess to be settlements, and are made by the authorized and proper officers, using their official titles in the act. They are made in the usual office forms, and deposited in the proper office, where they have since remained, and whence they were brought to be given in evidence in this cause They are duly certified, and were produced by the plaintiffs. They embrace subjects proper for settlement, and within the jurisdiction of the officers who made the settlements. They were made by officers, who had nothing to do with the accounts but to settle them. They were made thirty years ago. From that time to this, no further or other settlement has ever been made

of these accounts. They have never been called in question but once—that was by a creditor, a single objection was made, and was authoritatively decided in their favour. So far as to the accounts themselves; enough, certainly. But the evidence does not stop here. There is a mass of proof, besides, in the record, of irresistible force and weight.

They were recognized and sanctioned, as settlements, by John Nicholson himself. The two accounts of the 19th of November 1796, proved to have been in his possession, one by his own indorsement, and the other by indorsement of his counsel, refer to them as settled accounts. These papers, it will be observed, are not themselves settled accounts. They were then in course of settlement, which was completed in the following month, by giving him credits against the balance of the former settlements. The first item in each is a debit for the balance of the account previously "settled." It is material to remark that they come from amongst the private papers of Mr Nicholson. They were there for more than three years during his life, without disapprobation or objection. This is conclusive evidence of assent to what is contained in them. It would be so at any time. Still more is it so, after so great a lapse of years. It would be conclusive evidence against any one. A fortiori, is it conclusive against Mr Nicholson, who had been so long comptroller, and was acquainted with the forms of office. He knew the precise import of the word "settled." One of them was received by him in 1796, the other at least as early as the 21st of March 1797. This fact thus becomes an admission by John Nicholson himself that there had been a settlement according to law.

Again, if the argument on the other side be correct, these settlements were adopted, acted upon, and finally and conclusively agreed to, by the judgment in the supreme court in March 1797. The argument is that the judgment was for the amount of these settlements. If so, it was upon the settlements, and affirmed them.

Further, in the year 1803, one of these settlements was submitted to judicial investigation and decision in the supreme court of Pennsylvania. Smith v. Nicholson, 4 Yeates, 6. It was decided upon. That decision has been the uncontroverted law of Pennsylvania for twenty-seven years. It has been the

[Lessee of Livingston v. Moore and others.]

foundation of repeated legislation by public laws, as a reference to the several acts of assembly upon this subject will show. The judiciary was first appealed to, and when the rights of the commonwealth had been judicially ascertained, and not before, laws were made to render those rights effectual. The course pursued was the opposite of that which has been imputed. The legislature did not exercise its power upon the question of right. There was no arbitrary assumption or exertion of authority, no interference with the exercise of judicial power, no invasion of the province of the judiciary, nothing which bears the most remote resemblance to seizure or confiscation of property. But when the courts had decided that the property was liable for the debts due to the commonwealth, that the settlements were a lien, then, and not till then, the legislature interposed, (as it was rightfully bound to do) to devise the means of rendering the right effectual, to afford the needful remedy, to enforce the payment of a just debt out of the fund that was adjudged to be liable for it.

The first act of the legislature upon the subject, is that already referred to, of the 4th of April 1805, entitled, "An act for the more speedy and effectual recovery of debts, &c." It authorizes the sale of all the commonwealth's liens to Blythe and Nicholson, and directs the payment out of the moneys of the commonwealth of the taxes on the "lands of the late John Nicholson." The act of the 4th of April 1805 appropriates ten thousand dollars for the payment of the taxes. The act of 31st of March 1806 (one of those now in question) prohibits sales for taxes, and authorizes their payment out of the state treasury. The act of 19th of March 1807 asserts the lien. The act of 24th of March 1808 is a supplement to the act last mentioned, to give certain powers to those who purchase portions of the lien by way of compromise. The act of 28th of March 1814 is also a supplement, and prohibits sales for taxes. The act of 16th of March 1810 authorizes payment of taxes. And the act of 5th of February 1821 authorizes the issuing of process for the sale of land, in behalf of individuals named in it.

Here, then, are eight public laws of the commonwealth, extending through a period of sixteen years, all assuming the existence of the settlement and lien, and providing for the protection and security of the property, as the fund for the payment

of the debt. Public laws were suspended in their operation upon these lands. The taxes were paid out of the public treasury. Sales were made, purchases, compromises, and releases. There has been an universal acquiescence, especially by the numerous creditors of John Nicholson. But for this, the lands would long ago have been sold for debts or for taxes. It has been truly said, that it is owing to the interposition of the commonwealth alone, that there is any thing now to dispute about or claim.

This public fact has become extensively incorporated into land titles throughout Pennsylvania. Improvements have been made upon the faith of it. Transfers of property have assumed it, to an extent not to be defined, but, according to a printed paper put forth on the part of the plaintiffs, embracing more than two millions of acres.

Is it competent to the plaintiffs at this time of day to dispute the settlement? Can they be permitted, by such exceptions as are here presented to what was so long ago done, to disturb the titles thus derived under the laws of Pennsylvania? If there were not a paper or a witness, is there not ample evidence? Can they, who have lain by, now demand proof of what was done thirty-four years ago? To allow it, would encourage frauds, would destroy the security of property, and the peace of society. These are considerations of weight, and are estimated accordingly in the administration of justice. Chalmer v. Bradley, 1 Jac. and Walk. 63. More than time has now run to make a bar by statute. A mortgage would be barred in less time. A bond would be presumed paid. Almost any thing would be presumed in support of a right. The presumption comes in the place of evidence which time has effaced or destroyed, and to uphold that which has become so settled as to give assurance of itself, that it was originally fixed upon a sure foundation.

But what are the objections to the settlements? Can they not be refuted, even without aid from the principles which have been adverted to? It is impossible to avoid remarking of them, that they are altogether unworthy to be associated with the great points professed to be aimed at in this case. They tend to degrade their companions, and bring them into suspicion. What are they?

1. That there was no notice given of the settlements to John Nicholson.

The meaning of this objection must be that there is no *proof* of notice. It may be answered then, in the first place, that after such a length of time, it is not necessary. It will be presumed. In the next place, the settlement itself is sufficient. Either notice was required by the laws of Pennsylvania, or it was not. If it was not, there is an end of the matter. If it was, the presumption would be that the accounting officers did what the law required of them, at least until the contrary appeared. In the Commonwealth v. Fitler, 12 Serg. and Rawle, 277, (which was under a different law) the negative was proved. *That,* therefore, affords no rule in the present case. The whole accounting system of Pennsylvania is founded upon the act of 1782. That act contemplates settlement upon accounts produced by the accountant. 2 Dall. Laws, 45. He is, therefore, the actor, in general, and requires no notice.

But there is clear proof of notice in fact. The two papers before referred to, of November 1796, state the settlements to have been made, and no objection was ever taken to them, though John Nicholson lived for several years afterwards, and lived in the same city where the government was, and where the accounts were settled. It is quite incredible that he had not notice.

In addition to all this, the settlements were made under a public law of April 20, 1795, 3 Dall. Laws, 1790, specially directing the settlement of the accounts of John Nicholson. A public law is notice to every body.

It is sufficient, however, for the present case, that no law required notice to be given.

2. That these settlements were not "entered" in the books of the accounting officers, as it is alleged was required by law. The meaning of this, as of the former objection, is that there was no *proof* of the entry.

The first answer is, that there *was* proof. The plaintiffs themselves produced the settlements, and made them their own evidence, though they would have come in more properly on the part of the defendants. Both of them were accompanied by official certificates, by the proper officers, also given in evidence by the plaintiffs, that they were " settled and *entered.*"

VOL. VII.—3 R.

Can they deny this, without any proof to the contrary? The fact is, they were entered.

The next answer is equally decisive. The entry in the books is no part of the-settlement. It is *of* the settlement, and *after* the settlement. The settlement is completed, and after being completed, is then entered, as having been made. Act of 4th April 1792, 3 Dall. Laws, 218. In case of appeal, the entry would not be till after the appeal. Was there no settlement in the mean time? Then, there could be no appeal, for the appeal is from the settlement. The settlement is final before appeal, but its enforcement is suspended by the appeal. The entry could not be made till the officers were ready to certify to the governor.

3. It is objected, that these are not settlements of all the accounts of John Nicholson, and the officers were not authorized to settle in part. This objection is without any foundation in fact, for the books which it is supposed would prove it, are not in evidence.

But le, it be admitted, as it is probable that there were other accounts. It may perhaps be inferred that there were, from the various duties devolved upon him by different laws, and from the repeated appropriations for the expenses of investigating his accounts. Is the legal inference correct? Certainly not. There is no law which requires that a settlement should be of all accounts. On the contrary, the act of 20th of April 1795, 3 Dall. Laws, 790, directs them to be settled from time to time, in succession. This point also must be considered as having been decided in Smith v. Nicholson. In truth, the subjects of account were distinct and separate.

4. It may be suggested, that upon a general settlement, the balance might have been in his favour, though upon these accounts, it was against him. But to this suggestion, of a mere possibility, there are several decisive answers. First, the nature and duties of his trusts were such as to make it impossible there should be a balance in his favour. He could not be in advance, the accounts arising from property entrusted to him. Secondly, all the efforts to obtain a settlement, were on the part of the commonwealth. No aid was given by the accountant. What was obtained, was extorted from him. Finally, the confession of judgment is an unequivocal admission. **The whole**

.inquiry, however, it will be seen, is immaterial to the present purpose. It is stated only to show that there is not the slightest ground for the suggestion of even the possibility of injustice on the part of the commonwealth towards Mr Nicholson.

5. It has been intimated that the officers did not intend them to be settlements. Where such a notion could have been derived, it is difficult to conceive. For reasons already stated, it would be immaterial what they intended, if they officially did what produced a certain legal consequence. But the fact that they did intend them to be settlements, is apparent; for the act of 20th April 1795, made it their duty to *settle*. Again, they have always been treated as settlements, by every department of the government: and, in addition, they were acknowledged by Mr Nicholson himself to be such, as has already been shown.

There are some other objections made. It is unnecessary to go through them in detail, as they have already been sufficiently answered.

2d. Did these settlements constitute a lien, and what was the nature of the lien?

It can scarcely be necessary to consider this question upon original grounds, having been long ago decided by the supreme court of Pennsylvania. A short view, however, will suffice to show how well grounded that decision was. It may be premised, that the accounting laws of Pennsylvania are not in derogation of the common law, or of the usual course of proceeding. Neither can it be said that they establish new powers, for the benefit of the party creating them, and direct their execution in an unusual manner. They are not, therefore, obnoxious to a construction of such strictness as has been suggested. They are not at all within the reason of Schip v. Miller's Heirs, 2 Wheat. 325, as laws giving powers of forfeiture. They are remedial, not penal. They are laws for the settlement of public accounts, and for the payment of public creditors, as well as the collection of public dues. They are salutary and necessary. They are entitled to a fair construction.

These laws are all to be considered, in the construction of any one of them. The act of 4th April 1792, sect. 1, 3 Dall. Laws, 222, contains a special repeal of so much of every former

act as is thereby altered or supplied, and no more.    Thus, the
whole of the acts of assembly, from the 13th April 1782 to 4th
April 1792, form one system, and are to be construed together.
It may be said, then, in the first place, that the lien of the act
of 1785 is no where expressly taken away.    Neither is it any
where expressly " altered or supplied."    Is it done by impli-
cation?    Assuredly not, as a moment's attention will discover.
By the act of 1782, the comptroller's settlement was made
conclusive, and summary process was authorized to be issued
immediately against the property and person of the debtor, not
unlike that given by the law of the United States of the 15th
May 1820, 2 Dall. Laws, 44.    The act of 1785, 2 Dall. Laws,
247, was to give the benefit of trial by jury.    For that purpose
the third section gave an appeal.    The appeal, of course, sus-
pended the issuing of process to enforce the settlement.    In
lieu of it, and to secure to the commonwealth the recovery of
what might finally appear to be due, the twelfth section gave
the *lien*.    The appeal and the lien, therefore, came into exist-
ence together, and the one was given precisely because the
other was given.    The natural conclusion would be, that they
would continue together, the reason being the same for keep-
ing them associated, as for originally associating them.    The
appeal continued throughout; therefore, the lien continued
throughout.    Such must have been the intention of the legis-
lature.    It cannot, with any propriety, be said to be oppressive
or unjust.    On the contrary, it is part of a system for the relief
of the accountant, which, but for the lien, would not be con-
sistent with a due regard for the security of the commonwealth.

The only argument against the lien is founded upon that
part of the twelfth section which speaks of the executive coun-
cil.    The answer to it is an obvious one.    By the third section,
the approbation of the executive council was necessary to
make a settlement.    The powers of the executive council
were transferred to the governor, and the concurrence or ap-
probation of the governor ceased to be necessary after the act
of the 21st September 1791, 3 Dall. Laws, 113, except where
there was a disagreement between the comptroller and the
register, in which case the governor was to decide between
them.    If they agreed, their settlement was effectual.    To
suppose that the governor's interposition had any effect upon

[Lessee of Livingston v. Moore and others.]

the question of lien, would lead to this absurdity, that where the accounting officers differed, the settlement would be a lien; where they agreed, it would not.

But why should this question be argued? It has been judicially decided by the supreme court of Pennsylvania twenty-seven years ago, and is the settled law of the state. Smith v. Nicholson, 4 Yeates, 6; United States v. Nichols, 4 Yeates, 251. Such a decision, upon acts of assembly of a state, in the state courts of the highest authority, has been repeatedly adjudged here to be conclusive evidence of the law of the state. Hinde v. Lessee of Vattier, 5 Peters, 393; Ross v. M'Lung, 6 Peters, 283; 1 Conn. Rep. 159, in notes. It has been said that the supreme court of Pennsylvania would not, themselves, be bound by their own decision, and to prove it, we are told that in Bevan v. Taylor, 7 Serg. and Rawle, 397, (a case turning upon the construction of the intestate laws) they overruled Walker's Administrators v. Smith, 3 Yeates, 480. But admitting this to be so, it is only necessary to say, that Smith v. Nicholson never has been overruled or questioned. It is the law of Pennsylvania now, whatever possibilities there may be as to the future. If it should hereafter be overruled, it will *then* cease to be authority, but not before. This, however, is not likely to happen. It is too deeply rooted to be overturned without extensive mischief, an argument admitted by the supreme court of Pennsylvania to be of great weight in favour of supporting ancient decisions. 7 Serg. and Rawle, 400.

The nature of the lien is sufficiently explained by the words of the act of assembly. It extends to all the lands of the debtor throughout the commonwealth.

2. The second lien of the state was under the judgment of the 21st March 1797 in the supreme court of Pennsylvania, for one hundred and ten thousand dollars. This, like the lien by settlement, bound all the lands of Mr Nicholson throughout the commonwealth. Such is conceded to have been the effect of judgments obtained in the supreme court of Pennsylvania before the passing of the act of 1799.

3. By the death of John Nicholson, the state had a lien, and still continues to have a lien, as a creditor, upon all his lands in Pennsylvania. The lands of a decedent are bound for his debts. Graff v. Smith, 1 Dall. 481; Morris v. Smith, 1 Yeates,

238, 4 Dall. 119. In favour of purchasers, this lien is limited to seven years. Against heirs, it is without limitation.

It appears thus, upon reviewing the case,

1. That there was a debt, conclusively and finally ascertained to be due to the commonwealth.

2. That this debt was a lien upon the land.

3. -That it was of the nature of that lien, to give a right to raise the money out of the land by sale.

4. That there was no process to effectuate this right.

Could the legislature provide the remedy? That is really the only question that remains. The points above stated being all settled, was it or was it not competent to the legislature to devise the means of doing what every one must agree ought to be done? This brings us to the second general head of inquiry.

II. Are the acts of 1806 and 1807 unconstitutional and void?

As has been already seen, they are strictly and bona fide remedial acts, to enforce the payment of debts justly due, out of a fund admitted to be liable for their satisfaction. They had no other object or intention. They were to supply a defect of suitable process, so that the creditor might have justice done him, and that against a public accountant, whose debt was evidence of official delinquency. They have worked no injury to any one. The heir had nothing until the debts were paid. Wilkinson v. Leland, 2 Peters, 629. The property was insufficient to pay even the debt due to the commonwealth, as a fair public sale has ascertained. There was nothing for the heir. Was the legislature incompetent to supply the process? Those who affirm a proposition so extravagant, ought to make it out very clearly. A constitution imposing a restriction so unreasonable, would require to be altered. It is against every notion of what is expedient and what is just. The right of a creditor is a perfect right; it is as strong as the right of property, and has as strong a claim to protection. To take away all remedies from the creditor would be unconstitutional. To withhold from him adequate remedies, is contrary to the spirit of our social compacts. How, then, can it be unconstitutional to give him an adequate remedy? There is a glaring contradiction in the hypothesis. Common sense is confounded by it.

The purpose being a lawful one, the legislature really and truly adopted the means which they thought necessary for its attainment.   They did not confiscate the lands; they did not seize upon them: they simply devised a mode of selling them, so that out of the proceeds, the debt owing to the commonwealth might be paid.   The objection, then (if any there be), is only to the mode.   This is a very narrow ground indeed. It is, that the legislature, in the exercise of a discretion which belongs to them, did not select the mode which to others may seem most fit.   This is neither more nor less than to deny to them all discretion in the use of means ; to limit them, where their power is usually deemed to be the most unlimited.   There is no doubt whatever, that the method of proceeding they adopted, was in fact the best.   But that is a discussion not to be entertained in a judicial investigation.

Before proceeding to examine the particular objections which have been made to these laws, it is necessary to establish the test they are to be submitted to, by referring to certain well settled principles of constitutional law.

1. It may be stated, upon clear authority, that a question of conflict between a law of a state and the constitution of the state, is not a question of federal cognizance.   The judiciary of the union has a clear paramount authority in all cases where there is a question whether a state law is repugnant to the constitution of the United States.   Satterlee v. Mathewson, 2 Peters, 380; Jackson v. Lamphire, 3 Peters, 280.   But a question between a state law and a state constitution, comes into this court only in its administration of the laws of the state.   It will be guided, therefore, by state decisions ; giving the law to the state tribunals in questions of federal cognizance, and receiving it from them in questions properly of state cognizance.   Judicial harmony is thus preserved.

2. That the constitution having received a construction by legislative, executive and judicial action, and the acquiescence of the citizens for a long time, that construction will prevail in judgment, especially if rights be founded upon it.   Stuart v. Laird, 1 Cranch, 292; M'Cullough v. State of Maryland, 4 Wheat. 316.

3. That there must necessarily be a limit in time to the

right of individuals to question the constitutionality of a law, where, by so doing, they would injure others who have acted upon a received construction, or overturn what has been done.

4. That it is incumbent upon those who would thus impeach a law, plainly to show a plain violation of some express provision of the constitution, so that laying the constitution and the law side by side, there is a manifest incompatibility.

" It is a power of high responsibility, and not to be exercised *but in cases free from doubt.*" Tilghman, C. J. 3 Serg. and Rawle, 73.

" The question whether a law be void for its repugnancy to the constitution, is a question which ought seldom, if ever, to be decided affirmatively in a doubtful case. The opposition between the constitution and the law should be such, that the judge feels a clear and and strong conviction of their incompatibility with each other." Marshall, C. J. 6 Cranch, 128. " Must plainly violate some express provision of the constitution." Washington, J. 2 Peters, 330. And as to all speculative objections, founded upon supposed general principles, they are entirely put aside by Chase, J. in 4 Dall. 18. General principles in the constitution are not to be regarded as rules to fetter and control, but only as declaratory or directory.

5. That where a power is given by the constitution, the choice of means for effectuating it belongs to the legislature. United States v. Fisher, 2 Cranch, 358; M'Cullough v. State of Maryland, 4 Wheat. 316.

6. That an act may be constitutional in some of its provisions and unconstitutional in others, and the latter will not hurt the former.

7. That it may be unconstitutional against one person, and not against another, and the latter cannot avail himself of the privilege of the former. If the acts in question were objectionable against creditors, (as they certainly are not) they might be good against the heirs.

It will be perceived, at once, how these principles meet and obviate every objection that has been made. Before proceeding to examine these objections in detail, try them by another very simple test. Is there any thing in the constitution of the United States, or of the state of Pennsylvania, which says that a man's

property shall not be sold for the payment of his just debts? Is there any thing which says the legislature shall not be allowed to judge of the means? Leland v. Wilkinson, 2 Peters, 656, 657, &c. is exactly to the contrary, and is to the very point of the present case.

It is no objection, founded in the constitution, that laws are retrospective. The constitution itself is decisive of this. The express prohibition of ex post facto laws, meaning retrospective *criminal* laws, is an admission that retrospective *civil* laws may be made. Expressio unius exclusio est alterius. No well digested constitution could contain such a prohibition. It may be conceded, that in general they are against the principles of sound legislation. But occasions will sometimes occur where they are necessary. These cases make exceptions. That retrospective laws are not, on that account, unconstitutional, has been repeatedly decided in Pennsylvania. Barnbaugh v. Barnbaugh, 11 Serg. and Rawle, 191; Underwood v. Lilly, 10 Serg. and Rawle, 97; Barnet v. Barnet, 15 Serg. and Rawle, 72; and was decided in this court in Satterlee v. Mathewson, before referred to. But the laws now in question are in no sense retrospective. They are entirely prospective.

Neither is it any objection that laws may seem to exercise judicial functions. Estep v. Hutchinson, 14 Serg. and Rawle, 435. The line is not so defined as to mark exactly in all cases the boundary between legislation and judgment.

Nor is it any objection that they constitute new tribunals. The legislature have power to do so by the constitution of Pennsylvania. Article 5, sect. 1.

Objections are not to be listened to, which have no better foundation than a general charge of injustice, or an appeal to what is supposed to be a sort of prevailing complexion of the constitution. These are arguments to be addressed to the legislature, when they are enacting laws, perhaps to the judiciary when expounding them, but never when called upon to declare such laws to be incompatible with the constitution. If ever admissible, however, they would be inapplicable in the present case, where nothing has been done but what is just in itself, and in conformity with the soundest principles of legislation.

The specific constitutional objections made by the plaintiffs

in error, are sufficiently numerous. But their weight is in no proportion to their number. They are only so many cyphers.

1. It is said to be an infraction of section 10, article 1, of the constitution of the United States, and section 17 of the bill of rights of Pennsylvania. The one prohibits the making of state laws impairing " the obligation of contracts," the other prohibits laws " impairing contracts." They are in substance the same.

A contract will not be implied, in order to render a law obnoxious to the constitutional prohibitions. Hart v. Lamphire, 380.

But here there is no contract, express or implied.

The grant of the land, by warrant and survey, was no contract that it should not be liable for the debts of the owner. It was exactly the reverse. The grant made him the owner, with the power to aliene, and subject to alienation by process of law. It was to him, his heirs and assigns. Land is liable for the debts of the owner, is bound by judgments, and may be sold for the payment of his creditors. This is an incident to ownership, not repugnant to it, but one of its legal consequences. There is no resumption of the grant, as in Fletcher v. Peck, but a confirmation of it. All this is fully and clearly explained in Satterlee v. Mathewson, 2 Peters.

The *settlement* is no contract, nor the lien arising from it. The latter is to operate " in the same manner as a judgment," that is, to bind in the same manner. It is *in invitum*, obtained by compulsion of law, and not deriving any of its efficacy from the agreement of the party. The means of enforcing it, too, are derived from the law, and may be varied by the legislative power. They are not limited to such as may be in use when the judgment is obtained.

There was no restriction in the special entry of the judgment, except that which was expressed, namely, that Mr Nicholson should have a limited time to point out errors. The time being expired, without error being alleged, the judgment stands for the whole amount for which it was confessed.

These laws not only violate no contract—they are in execution of a contract. All public dues bind by contract. There is an implied assumpsit. The claim upon Mr Nicholson was still stronger, being founded upon his official contract, as well

as upon the contract arising from his applying the money and property of the commonwealth to his own use.

2. There can be no necessity for saying more in reply to the second objection, than that the eighth section of the bill of rights of Pennsylvania, relates only to seizure and search, and here, there was neither seizure nor search. Both these words have an appropriate legal sense, well understood.

3. It is said to violate the seventh article of the amendments to the constitution of the United States, and the sixth article of the bill of rights of Pennsylvania.

If this amendment of the constitution of the United States were applicable to the states, (as it is not) it would still be impossible to understand how the present case could be brought within its words or meaning. It was no " trial at common law." The execution of a judgment was what was in question.

The sixth article of the bill of rights of Pennsylvania says nothing more than this: " trial by jury shall be as heretofore, and the right remain inviolate." Was it ever the practice to have trials after judgment? Were juries ever used in such cases before? An inquest to ascertain whether the rents and profits will pay in seven years, is not a jury in the sense of this article. It owes its existence to an act of assembly which the legislature may at any time repeal or alter: and, in addition, it never was necessary in a case like this, of vacant and unseated land, (as the land in question was at the time of the sale) but only where lands are improved and yielded an income.

4. It is said to contravene the fourth article of the bill of rights. The answer is manifest. That article applies only to criminal prosecutions. If otherwise, it has been literally complied with.

Neither can it be said with any propriety, that this property was taken for public use without compensation. It was not taken at all, but sold for the payment of debts. There was no exercise of the right of eminent domain.

There is want of precision in the argument which imputes to these acts as an objection, that they were made by the legislature in its own case. The debt was owing to the commonwealth. The commonwealth was the creditor, the entire body politic, made up of all the citizens of Pennsylvania. The legislature was only a branch of the government. That the legislation was about matters which concerned the commonwealth,

can surely be no valid objection, for these are peculiarly the proper subjects of legislation. The members of the legislature are no more interested than any other citizen.

In every aspect, therefore, in which the case can be reviewed, it appears that the proceedings of the commonwealth of Pennsylvania have been just, prudent, patient, and intelligent, as well as entirely consistent with the constitutions of the union and the state. The government in all its branches has done its duty, and has done no more. The proceedings have been right in form and in substance. To have established this, is all that can be necessary to vindicate the commonwealth against every charge that has been made, and renders it superfluous to notice the terms in which they have been so repeatedly presented. They perish of themselves, when they are thus shown to be without foundation. The respect due to the source from which they proceed, cannot sustain them now, whatever claim to attention it may have given them in the first instance, before they were examined. With them also fall the exceptions to the judgment of the court below upon the points here discussed, all of which have been embraced in the discussion.

The exceptions to the opinion of the court below, upon questions of evidence, now assigned for error, have been fully considered.

Mr Justice Johnson delivered the opinion of the Court.

This case comes up by writ of error from the circuit court of the United States of Pennsylvania, in which the plaintiffs here, were plaintiffs there. The plaintiffs make title as heirs of John Nicholson, and the defendants as purchasers under certain commissioners, constituted by a law of that state for the purpose of selling the landed estate of John Nicholson; in satisfaction of certain liens which the state asserted to hold on his lands. The plaintiffs controvert the validity of that sale:

1st. As violating the constitution of Pennsylvania.

2d. As violating the constitution of the United States.

3d. As inconsistent with the principles of private rights and natural justice, and therefore void; though not to be brought within the description of a violation of any constitutional stipulation.

1. To maintain the argument upon which the counsel for plaintiffs rely, to establish the unconstitutional character of the acts under which the sale was made to defendants; the plaintiffs' counsel commenced with an effort to remove out of his way the liens, to satisfy which the legislature professes to pass the acts authorizing the same.

It appears from the record that at the time of passing the acts which constituted this board of commissioners, to wit in 1806 and 1807, the state claimed to hold four liens upon the lands of John Nicholson.

1st. A judgment for special damages, amounting to four thousand two hundred and eight pounds eight shillings, entered December 18th, 1795.

2d. A settled account of March 3d, 1796, for fifty-eight thousand four hundred and twenty-nine dollars twenty-four cents, afterwards reduced to fifty-one thousand two hundred and nine dollars twenty-two cents.

3d. Another settled account of December 20th, 1796, for sixty-three thousand seven hundred and twenty-seven dollars eighty-six cents.    And

4th. A judgment confessed and entered March 21st, 1797, for one hundred and ten thousand three hundred and ninety dollars, with certain special matter attached to the confession, wholly immaterial to the present controversy.   The evidence of dates and circumstances might seem to lead to the opinion, that the first judgment or the consideration of it was incorporated into the settlements, and that the judgment of 1797 covered the whole.   But, of this there is no sufficient evidence; and the several liens must, on the facts in proof, be considered as they are exhibited on the record, as substantive and independent.

By a law of Pennsylvania of February 15th, 1785, settlements made by the comptroller, with certain prescribed formalities, are declared to be liens upon the real estate of the debtor, " in the same manner as if judgment had been given in favour of the commonwealth against such person for such debt in the supreme court."   A right of appeal is given if the debtor is dissatisfied, with injunctions that the court shall give interest for the delay, if the appeal is not sustained; but, unless such appeal is made and judgment against the debtor, there is no

provision in the law for enforcing satisfaction of the lien by sale or otherwise. It is made to be a dead weight upon the hands of both debtor and creditor, without the means of relieving the one or raising satisfaction for the other.

A great proportion of the argument for plaintiffs, both here and below, was devoted to the effort to prove that the two settlements enumerated were not subsisting liens at the time of passing the two acts of 1806 and 1807, under which the sale was made to the defendants. But, from this, as a subject of adjudication, we feel relieved by the two decisions cited from the fourth volume of Yeates's Reports: since it appears that this very lien of the 3d of March 1796, has been sustained by a decision of the highest tribunal in that state, as long ago as 1803 (Smith and Nicholson); and that again in 1805, this decision was considered, and confirmed, and acted upon, in another case in which the several applications of the principles established in the first case came under consideration. United States v. Nichols.

Now the relation in which our circuit courts stand to the states in which they respectively sit and act, is precisely that of their own courts: especially when adjudicating on cases where state lands or state statutes come under adjudication. When we find principles distinctly settled by adjudications, and known and acted upon as the law of the land, we have no more right to question them, or deviate from them, than could be correctly exercised by their own tribunals.

It is proper here to notice a relaxation of this principle, into which the court below seems to have been surprised; and in which the argument of counsel in this cause, was calculated to induce this court to acquiesce. In the case first decided in the supreme court of Pennsylvania, to wit that of Smith and Nicholson, 4 Yeates, 8, most of the arguments made use of in this cause to get rid of the lien of the settlement, and particularly that of a repeal of the act of 1785, or a want of compliance with its requisitions, were pressed upon that court, and carefully examined and disposed of by the judges. But there have been a variety of other grounds taken in the court below in this cause, and again submitted to this court in argument, which do not appear from the report of that decision to have been brought to the notice of the state court. Such were

the want of notice of the settlement; the want of its being entered in the books of the accounting officer; the balance not being struck in dollars and cents; that the order of settlement was reversed, and as the plaintiffs' counsel proposed to establish by evidence, that it was not a final and conclusive adjustment of all the existing debits and credits between the parties. Into the examination of most of these arguments the court below has entered with a view to estimating and repelling their sufficiency, to shake the settlement in which the lien of the settlements is claimed. But we cannot feel ourselves at liberty to pursue the same course; since it supposes the existence of a revising power inconsistent with the authority of adjudications on which the validity of those liens must now be placed. The rule of law being once established by the highest tribunal of a state, courts which propose to administer the law as they find it, are ordinarily bound, in limine, to presume that, whether it appears from the reports or not, all the reasons which might have been urged, pro or con, upon the point under consideration, had been examined and disposed of judicially.

It is next contended that the judgment of March 1797, had absorbed or superseded the liens of the settled accounts.

This ground they proposed to sustain by giving in evidence the journals of the house of representatives of the commonwealth, exhibiting certain reports of the register-general and of the committee of ways and means, conducing to prove that this judgment was rendered for the identical cause of action on which the settlements were founded. This evidence was rejected by the court; and that rejection constitutes one of the causes of complaint on which relief is now sought here.

But this court is satisfied that, supposing the evidence of these journals sufficient to prove the identity, and in other respects unexceptionable, establishing that fact would not have benefited the cause of the plaintiffs. On this point there is an unavoidable inference to be drawn from the case United States v. Nichols; for in that case, the lien of a settlement of prior date in favour of the state, was sustained against a subsequent mortgage to the United States; although, as the case shows, there was a judgment upon the same cause of action with the settlement, of a date subsequent to the mortgage to the United States, and obtained upon an appeal from the settlement.

Mr Dallas, for the United States, argued, that this appeal suspended the lien; but no one seems to have imagined that the judgment superseded or absorbed the settlement. If to this be added what was asserted by defendants' counsel, and acquiesced in by the plaintiffs'; that by the settled law of Pennsylvania, a judgment in an action of debt upon a previous judgment, does not destroy the lien of the first judgment, it puts this question at rest.

In approaching the acts of 1806 and 1807, we are then authorized in assuming, that. at the time they were passed the state held unsatisfied liens upon the lands of John Nicholson to a large amount, under the two settlements of 1776, without any legal means of raising the money by sale; and also judgments to a great amount, which, by reason of the death of Nicholson, and the want of a personal representative, they were equally precluded from all ordinary means of having satisfied. Thus circumstanced, the legislature passed those acts, the professed and unaffected and only object of which was to raise, from the sale of John Nicholson's land, money sufficient to satisfy the liens of the state. In justice to the moral as well as legal and constitutional character of those laws, it is proper to give an outline of their provisions.

It is obvious from the evidence in the cause, that between the date of the settled accounts and the passing of those acts, great changes had taken place in the possession and property of the lands of John Nicholson. Whether in any or all the cases of such change of property, the tracts sold became discharged of the liens of the state or not, is not now the question: if they were, the holders were at liberty to assert their rights against the state. In this case no such discharge is set up; the tract was one that had remained the property of Nicholson. There were then three interests to be regulated; first, that of the state; second, that of the persons in possession; and third, that of the heirs of Nicholson. That the state was not unmindful of the last, is distinctly shown by the offer of compromise tendered to the family before the act of 1806 was passed, and by adopting a mode of sale calculated as much as possible to avoid throwing back the purchaser upon the heirs for damages, where sales had been made by their ancestor. Hence, the plan of the act of 1806 was this: first, to ascertain

all the lands affected by the lien throughout the state; then to assess each rateably, according to the amount of the debt, instead of selling each and all as they could be discovered; at the same time allowing a discretion in the commissioners to compromise with persons claiming an interest in the lands, and to assign over an interest in the lien proportionate to the sum received upon such compromise; of course, obviating, so far, the necessity of a resort to a sale or to litigation.

Here there was a general offer to all persons claiming an interest in these lands, of a release from the lien, upon paying the sum thus assessed rateably and according to value; and it was only when the offer was not accepted, or where no one claimed an interest, that the general power to sell came into exercise. Nor was it then to be exercised until after a report made to the governor, and under process issuing from him: ample notice was required to be given of the sale, and a credit not exceeding four years allowed.    It is true, that by the terms of these acts, the power of selling is extended to " any body of lands, late the property of the said John Nicholson deceased, *which are subject to the lien of the commonwealth,* under and by virtue of process to be issued by the governor, either in gross or by separate tracts, as to them, or a majority of them, may appear most advisable;" but there is nothing which authorizes or requires the commissioners to sell *all the lands* of J. Nicholson, or an acre more than what is necessary to satisfy the liens: and so the words, just recited, import; since, after raising by sale enough to satisfy the liens, it could no longer be predicated of any of those lands that " they are subject to the liens of the commonwealth," in the language of the section which gives the power to sell. And it is true also, that the money is required to be paid by the purchasers into the treasury; but this is obviously a measure solely intended to secure the proceeds from again falling into dangerous hands; and if the power to sell be limited by its very nature and terms, to the raising of enough to satisfy these liens, on what ground can exception be taken to this precaution? How can it work an injury to heirs or creditors? to say nothing of a reasonable dependence upon the justice and good faith of the country to refund any surplus, supposing the commissioners were at liberty to raise a surplus by sale.

Nor can any reasonable exception be taken to the discretion-

ary power given to sell " in gross or by separate tracts ;" when it is considered how very possible it was that sales might be effected in gross when they could not be made in detail. Speculators might not be induced to adventure otherwise, and the separation of contiguous tracts might often destroy or diminish the value of each.

After presenting this exposé of the design and operation of these laws, we shall search in vain in the constitution of the state or the United States, or even in the principles of common right, for any provision or principles to impugn them: and on this point I am instructed to report it as the decision of this court, that the words used in the constitution of Pennsylvania, in declaring the extent of the powers of its legislature, are sufficiently comprehensive to embrace the powers exercised over the estate of Nicholson in the two acts under consideration, and that there are no restrictions, either express or implied, in that constitution, sufficient to control and limit the general terms of the grant of legislative power to the bounds which the plaintiffs would prescribe to it.

For my self, individually, I must use the privilege of assigning the reasons which claim my concurrence in that opinion.

The objection made to the exercise of this power is, that it is one of a judicial character, and could not exist in the legislature of a country having a constitution which distributes the powers of government into legislative, executive and judicial.

I will not pause to examine the question, whether the subjection of property to the payment of judgments, be in fact a matter appertaining essentially to *judicial* power ; or whether, after deciding that the debt is due, the judgment action does not cease, and all that follows is the exercise of legislative or executive power; another view of the subject will, in my opinion, dispose of this question.

The power existing in every body politic is an absolute despotism : in constituting a government, the body politic distributes that power as it pleases, and in the quantity it pleases, and imposes what checks it pleases upon its public functionaries. The natural distribution and the necessary distribution to individual security, is into legislative, executive and judicial ; but it is obvious that every community may make a perfect or imperfect separation and distribution of these powers at its will. It has pleased Pennsylvania, in her constitution,

[Lessee of Livingston v. Moore and others.]

to make what most jurists would pronounce an imperfect sep-
aration of those powers; she has not thought it necessary to
make any imperative provision for incorporating the equity
jurisdiction in its full latitude into her jurisprudence : and the
consequence is, as it ever will be, that so far as her common
law courts are incapable of assuming and exercising that
branch of jurisdiction, her legislature must often be called upon
to pass laws which bear a close affinity to decrees in equity.
Of that character are the acts of 1806 and 1807 under consid-
eration. The relations in which the state and John Nichol-
son's estate stood to each other, presented a clear case for
equitable relief; a lien on the one hand, and property to satisfy
it on the other, but no common law means of obtaining a sale.
Thus circumstanced, is there any thing in the constitution of
Pennsylvania to prevent the passing of these laws?

When it is intimated that the separation of the primary pow-
ers of government is incomplete under the constitution of
Pennsylvania, it may be necessary to submit a few observations
explanatory of the idea.

It is true that the separation of common law from equity
jurisdiction is peculiar to Great Britain; no other of the states
of the old world having adopted it. But it is equally true that
in no other of the states of the old world did the trial by jury
constitute a part of their jurisprudence, and every practical
lawyer knows that to give jurisdiction to a court of equity, or
to distinguish a case of equity jurisdiction from one of common
law under the British practice, the averment is indispensable
that the complainant is remediless at law. When it is said
that the separation of common law from equity jurisdiction is
peculiar to Great Britain; it must only be understood, that it is
there exercised by distinct courts and under distinct forms.
For, as an essential branch or exercise of judicial power, it is
acknowledged to exist every where : nor is it possible for any
one acquainted with its nature and character, and the reme-
dies it affords for the assertion of rights or the punishment of
wrongs, to doubt that the power to exercise it, and the means
of exercising it, must exist some where; or the administration
of justice will be embarrassed if not incomplete. To adminis-
ter it through the ordinary powers of a common law court is
impracticable; and hence, wherever there exists no provision

in the jurisprudence of a country for its full exercise ; the consequence must ever be, that after the common law courts have ingrafted into their practice as much as can be there assumed, the legislature is compelled to exercise the rest ; or else leave a large space for the appropriate field of judicial action unoccupied.

A specimen of this will be found in the early legislation of the state of South Carolina, in which, before the establishment of a court of equity, laws are frequently found authorizing administrators or others to sell lands for the payment of debts, and for similar purposes. And it has been admitted in argument, that similar laws are of frequent occurrence in Pennsylvania.

The provisions of the constitution of that state on the subject of legislative and judicial power, are as follows. Art. 1, sect. 1. "The legislative power of this commonwealth shall be vested in a general assembly, which shall consist of a senate and house of representatives."

Art. 4, sect. 1. " The judicial power of the commonwealth shall be vested in a supreme court, in courts of oyer and terminer and general jail delivery, in a court of common pleas, orphan's court, register's court, and a court of quarter sessions of the peace of each county, in justices of the peace, and in *such other courts* as the legislature may from time to time establish."

Art. 4, sect. 6: " The supreme court and the several courts of common pleas, shall, besides the powers heretofore usually exercised by them, have the powers of a court of chancery so far as relates to the perpetuating of testimony, the obtaining of evidence from places not within the state, and the care of the persons and estates of those who are non compos mentis ; and the legislature shall vest in the said courts such other powers to grant relief in equity as *shall be necessary*, and may from time to time enlarge or diminish those powers, or vest them in such other courts as they may judge proper for the due administration of justice."

It is clear from these quotations, that the legislature possess all the legislative power that the body politic could confer, except so far as they are restricted by the instrument itself. It is equally clear that the constitution recognizes the distinction between common law and equity powers, and the existence of equity powers beyond what it has vested in the supreme court.

[Lessee of Livingston v. Moore and others.]

But what provision has it made for the exercise of those powers? No other than this, that the legislature shall vest in the said courts such other powers to grant relief in equity as shall be found necessary. But where is the limitation prescribed to the legislature in judging of the necessity of vesting such powers? They have not thought it necessary to invest their courts with such powers : and if the reason which influenced them in judging it unnecessary was, that they held themselves competent to afford the necessary relief by the exercise of legislative power ; where is the restriction in the constitution that controls them in thus extending or applying the powers with which they hold themselves to be constitutionally vested? They are sought in vain.

Again, "they may from time to time enlarge or diminish those powers, or vest them in such other courts as they shall judge proper, for the due administration of justice." Now they have, by the first section of the same article, the power to establish what courts they please ; and suppose they thought proper to have vested the whole equity jurisdiction not specifically disposed of, in a board of commissioners, instead of vesting specific powers in such a board, where is the constitutional provision that inhibits such an act of legislation?

The plaintiffs contend that it is to be found in the bill of rights of that state or in the constitution of the United States.

Both those constitutions contain the provision against the violation of contracts; and the plaintiffs' counsel insists that there were three contracts in existence between the state of Pennsylvania and John Nicholson, two of them express, and one implied.

The first express contract he finds in the acts of 1782 and 1785 ; which, in giving the lien upon public accounts, declare that they shall be liens "in the same manner as if judgment had been given in the supreme court." This he construes into a contract that they shall be enforced in the same manner as such a judgment, to wit by judicial process ; and then finds the violation of the contract, in the acts which provide for the raising of the money to satisfy those liens by the sale of the land, through this board of commissioners. But a single observation we think disposes of this exception ; which is, that the lien of a judgment, of a mortgage, or any other lien, is a

very different idea from that of the means by which the lien is to be enforced; the one is the right, the other is the remedy : the one constitutes the contract, and the other the remedy afforded by the policy of the country, where it is not provided by the terms of the contract, for enforcing or effecting the execution of it. The first is unchangeable, without a violation of right; the other may be subject to change at the will of the government. And, it may be further observed in the present instance, that the reference to a judgment in the supreme court, is clearly descriptive or illustrative of the meaning of the legislature, with reference only to the *binding efficacy* of the lien given on these public accounts.

The second express contract is found by the plaintiffs in the confession of judgment on the 21st March 1797; and the violation of this also, is not enforcing it by judicial process.

This is obviously an attempt to give the character of a contract to that which is nothing more than an obligation, or duty, or necessity imposed by the laws of society. The confession of a judgment does indeed create a contract; but it is only on the side of the defendant, who thus acknowledges or assumes upon himself a debt, which may be made the ground of an action. But on the side of the plaintiff, the necessity of resorting to certain means of enforcing that judgment, is not an obligation arising out of contract, but one imposed upon him by the laws of the country.

Again, it may be answered, if there was in fact such a contract imputable to the state, the performance had become impossible by the act of God, and of the party himself, by his death; and by that confusion of his affairs, which prevented every one from assuming the character of his personal representative

We proceed to the third, or the implied contract; that which is deduced from the original grant of the land to John Nicholson. This sale, it is insisted, is inconsistent with that contract of grant; that it amounts in fact to a resumption of the land : and in connexion with this, the point of inconsistency with the reason and nature of things, was argued and commented upon.

The answer which the case here furnishes we think is this : that subjecting the lands of a grantee to the payment of his debts, can never impair or contravene the rights derived to

him under his grant, for in the very act, the full effect of the transfer of interest to him is recognized and asserted : because it is his, is the direct and only reason for subjecting it to his debts.

But it is asserted that in this case the community sits in judgment in its own cause, when it affirms the debt to be due for which the land is subjected to sale, and then subjects the land to sale to satisfy its own decision thus rendered.

This view of the acts of the state, is clearly not to be sustained by a reference to the facts of the case. As to the judgment of 1797, that is unquestionably a judicial act; and as to the settled accounts, the lien is there created by the act of men who, quoad hoc, were acting in a judicial character; and their decision being subjected to an appeal to the ordinary, or rather the highest of the tribunals of the country, gives to those settlements a decided judicial character: and were it otherwise, how else are the interests of the state to be protected? The body politic has its claims upon the constituted authorities, as well as individuals ; and if the plaintiffs' course of reasoning could be permitted to prevail, it would then follow, that provision might be made for collecting the debts of every one else, but those of the state must go unpaid, whenever legislative aid became necessary to both. This would be pushing the reason and nature of things beyond the limits of natural justice.

It is next contended, that the acts of 1806 and 1807 are unconstitutional and void, because contrary to the ninth section of the Pennsylvania bill of rights, which provides, in the words of magna charta, that no one shall be deprived of his property but by the laws of the land.

This exception has already been disposed of by the view that has been taken of the nature and character of those laws. It has been shown that there is nothing in this provision either inconsistent with natural justice or the constitution of the state: there is nothing of an arbitrary character in them.

They are also charged with being contrary to the ninth article of the amendments of the constitution of the United States, and the sixth section of the Pennsylvania bill of rights, securing the trial by jury.

As to the amendments of the constitution of the United States, they must be put out of the case; since it is now settled

that those amendments do not extend to the states: and this observation disposes of the next exception, which relies on the seventh article of those amendments. As to the sixth section of the Pennsylvania bill of rights, we can see nothing in these laws on which to fasten the imputation of a violation of the right of trial by jury; since, in creating the lien attached to the settled accounts, the right of an appeal to a jury is secured to the debtor: and as to the inquest given under the execution law, with a view to ascertaining if the rents and profits can discharge the debt in a limited time, as a prelude to the right of selling; we are well satisfied that there is no more reason for extending the provision of the amendment to that inquest, than there would be to the inquest of a coroner, or any other mere inquest of office. The word *trial*, used in the sixth section, clearly points to a different object; and the distinction between trial by jury and inquest of office, is so familiar to every mind, as to leave no sufficient ground for extending to the latter that inviolability which could have been intended only for the former. The one appertains to a mere remedy for the recovery of money, which may be altered at any time without any danger to private security; the other is justly regarded in every state in the union, as among the most inestimable privileges of a freeman.

The two remaining grounds urged for impugning the constitutionality of these laws, have been disposed of by observations already made.

It only remains to consider the point made upon the rejection of certain evidence proposed to be introduced; the object of which was to invalidate the settled accounts, by showing that, in fact, the accounts between the state and Nicholson never were settled, that is, finally and conclusively settled. Here again, as was remarked of the evidence already considered, admitting the fact proposed to be proved, what could it avail the party in this suit? As far as the accounts were settled and certified, the law gave the lien for the amount certified; and why should that benefit be deferred until the last possible shilling in dispute should be finally passed upon; delayed perhaps until lost, or until the debtor could no longer parry the decision; and thus give a preference to others at his will?

If, then, the fact intended to be established by the evidence

[Lessee of Livingston v. Moore and others.]

could not have availed the plaintiffs, the court could have committed no error in rejecting it, whatever may have been the reasons given for the rejection.

We are of opinion that there is no error in the judgment below, and it will accordingly be affirmed, with costs.


This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Pennsylvania, and was argued by counsel: on consideration whereof it is ordered and adjudged by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs.